**SHELL PIPE LINE CORPORATION**

v.

**UNITED STATES of America.**

**Civ. A. No. 65–H–342.**

United States District Court
S. D. Texas,
Houston Division.

March 31, 1967.

W. G. Winters, Jr., Houston, Tex., for plaintiff.

John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., and Robert L. Waters, Asst. U. S. Atty., Fort Worth, Tex., for defendant.

CONNALLY, Chief Judge.

This is a tax refund case. The plaintiff, a common carrier by pipeline of petroleum and petroleum products, seeks refunds of excess profit and income

taxes paid for the years 1953 and 1954.[1] The plaintiff made timely claims for refund which were disallowed, and this action was initiated within the time prescribed by law. This court is vested with jurisdiction (28 U.S.C.A. § 1346).

The single question presented is whether plaintiff is entitled to a depreciation deduction, for federal income tax purposes, based upon the exhaustion of its trunk line rights-of-way. The corollary question as to the amount of such depreciation—if any be allowable—by stipulation is reserved for further hearing.

Plaintiff's corporate background and experience in this field is as follows. The Yarhola Pipe Line Company, a common carrier of oil by pipeline, was organized in 1914. The plaintiff, Shell Pipe Line Corporation (Shell) was incorporated in 1919 under the corporate name Ozark Pipe Line Company and in that year acquired all of the properties of Yarhola. Plaintiff's corporate name was changed in 1927. The plaintiff's principal business consists of the transportation of crude oil from the oil producing areas of West Texas, East Texas, New Mexico, Louisiana, and the Rocky Mountain region by underground pipeline to refining areas in the Midwest and the Texas-Louisiana Gulf Coast; and in the transportation of refined petroleum products from the refining areas to market. During the years 1953 and 1954, and at all material times, plaintiff was regulated by the Interstate Commerce Commission under Part I of the Interstate Commerce Act, as well as by regulatory bodies of the several states with respect to its intrastate activities.

Shell's pipeline system may be divided into three categories: (1) gathering systems, which carry oil through relatively small diameter lines (usually of 2 to 4 inch diameter) from the producing wells to (2) secondary systems, which carry oil through larger diameter pipes from the various fields to the nearest (3) trunk or primary system, which carries oil great distances in large diameter lines (usually 10 to 24 inches) to the refineries, and which carry the refined products from the refineries to the market areas. Counsel for the defendant makes what I consider to be an apt analogy: a primary line may well be compared to the trunk of a tree; the secondary lines well may be compared to the principal branches thereof; while the gathering systems may be equated to the various small branches of a tree.

In order to construct its pipeline systems, Shell has acquired by purchase and condemnation, at substantial cost, grants of easement or rights-of-way from the owners of the lands across which its pipelines are laid. The costs involved in obtaining the rights-of-way are, in Shell's accounting practice, separated from the costs involved in laying the pipeline itself. The right-of-way account includes not only the amounts paid to the landowner for the easement in question, but includes related costs, as the salaries of the employees who were engaged in contacting and negotiating with the landowners; court costs in condemnation proceedings; and related items. These costs and expenses have been capitalized by Shell in its accounting records and for federal income tax purposes, and same represent capital investments.

The plaintiff has at all material times maintained its accounting records, and computed its annual net income, in accordance with the orders, regulations and the Uniform System of Accounts prescribed for its use by the Interstate Commerce Commission. Similarly, the plaintiff's treatment and record of costs and expenses incurred in the acquisition of rights-of-way is in accordance with the orders, regulations and Uniform System of Accounts of the Interstate Commerce Commission.

1. In controversy is the amount of approximately $47,000 of excess profit and income taxes for 1953; and approximately $31,000 of income taxes for the year 1954, plus interest, etc.

In 1934 the Interstate Commerce Commission rendered its decision in Docket No. 19200 entitled Depreciation Charges of Carriers by Pipelines, 205 ICC 33, requiring all common carriers by pipeline, including Shell, to make annual depreciation deductions on rights-of-way and other classes of carrier property.

In 1953 the Interstate Commerce Commission held a hearing on plaintiff's depreciation rates, and in its Sub-Order No. P-4-A the Commission fixed plaintiff's component depreciation rate on wholly owned trunk line rights-of-way at 3.64% (based upon a service life of 27.5 years), and fixed plaintiff's component depreciation rate on the undivided interest which it owned in other line rights-of-way at 3.33% (based upon a service life of 30 years).

To bring the issue presented by this controversy into focus, these observations seem pertinent. For regulatory purposes, Shell follows the system of accounting prescribed by the Commission, which recognizes (and, in fact, requires) the depreciation of its rights-of-way account on all its pipelines. The Internal Revenue Service has long conceded plaintiff's right to depreciate its line *pipe* (as distinguished from the easement or interest in land through which the pipe is laid). Additionally, the Internal Revenue Service has long conceded plaintiff's right to depreciate its rights-of-way with respect to its *gathering* systems. This is based upon the hypothesis that the particular wells, or perhaps the particular field, served by such gathering system will be exhausted, at which time the rights-of-way will be of no further value. In fact, from 1930 to 1943 Internal Revenue allowed depreciation on *all* of plaintiff's rights-of-way. However, since 1943 the Internal Revenue Service has refused to allow plaintiff a depreciation deduction on the capitalized costs of its *primary* and *secondary* pipeline rights-of-way. Hence Shell computed and paid its taxes for the years in question without benefit of a depreciation deduction on these items. This was what was in controversy prior to the date of trial.

Immediately prior to trial, the Internal Revenue Service further conceded that Shell was entitled to a depreciation deduction in connection with its *secondary* pipeline system rights-of-way. This left in issue only the deduction claimed for the *primary* pipeline system rights-of-way.

This classification (gathering lines, secondary trunk lines, and primary trunk lines) is Shell's own. It is not prescribed by the ICC system of accounting, which distinguishes only between (a) gathering systems, and (b) trunk systems. The classification is used by Shell only for tax purposes, presumably for some real or fancied benefit which might result therefrom.

At the time that the government conceded plaintiff's right to depreciate its secondary system rights-of-way, plaintiff concurred in such concessions and agreement. Now, however, Shell contends that this classification, in making a distinction between primary and secondary systems, is completely arbitrary; and asks that the court consider the retirement experience of both its secondary and primary systems in determining plaintiff's entitlement to depreciation on its primary system rights-of-way alone.

From the 1939 and the 1954 Internal Revenue Codes [2], which are essentially the same with reference to the matters here in controversy, the following principles may be adduced. A taxpayer may deduct, as a depreciation deduction, a reasonable allowance for the exhaustion, wear and tear of property used in his trade or business. The basis upon which such depreciation is to be allowed is the adjusted basis used in determining gain or loss on the sale or other disposition of such property. The adjusted basis for determining gain or loss from the sale or other disposition "shall be the cost of such property." Plaintiff's claim of the depreciation de-

---

2. See: Code of 1939; 26 U.S.C.A. §§ 23(a) (1), 113(a), 114(a). Code of 1954; 26 U.S.C.A. § 167(a), (f), § 1012.

duction here is based upon "the cost of such property." Similarly, from the pertinent regulations [3], the following is established. A reasonable allowance for the exhaustion, wear, tear and absolescence of the property used by the taxpayer in his trade or business for the production of income shall be allowed. The allowance is that amount which should be set aside for the year in question with a reasonably consistent plan whereby the aggregate of the amounts set aside, plus the salvage value, will at the end of the estimated useful life of the depreciable property equal the cost or other basis thereof. The estimated useful life of an asset is not necessarily the actual life, but it is the period over which the asset may reasonably be expected to be useful in the taxpayer's trade or business. This period is determined by reference to the taxpayer's experience with similar property; and some of the factors to be considered are (a) wear and tear, decay and decline from natural causes, (b) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (c) the taxpayer's policy as to repairs, renewals and replacements. If the taxpayer's experience is inadequate, the general experience in the industry may be used to determine the estimated useful life. An intangible asset known from experience or other factors to be of use in the business of the taxpayer for only a limited period, the length of which can be estimated with reasonable accuracy, likewise may be the subject of a depreciation allowance.

■ Right-of-way easement grants are "intangibles" and are properly so classified for income tax purposes.

At this point it would be well to summarize the arguments advanced by the parties. Pointing to the fact that by 1954 it had accumulated some 40 years of experience with respect to its trunk line operations, plaintiff contends that such experience shows that such rights-of-way have a limited useful life in the plaintiff's business, and that the length of such useful life can be estimated with reasonable accuracy. It argues further that if its own experience be insufficient, the experience in the industry may be examined to establish this fact. Plaintiff's evidence to support this position tends to show that during its history it has retired approximately one-third of its secondary trunk lines, and two of its six primary trunk lines. Statistical and accounting testimony has been offered tending to show that in the plaintiff's experience, as well as in the experience of the industry, the useful life of the rights-of-way closely parallels the useful life of the pipe.

This is so, the plaintiff argues, because when the pipe itself, by reason of erosion, wear and tear, is no longer serviceable, a new and replacement pipe is never laid in the same ditch. On some occasions, as shown by plaintiff's history, a second pipe line may be laid parallel to and in close proximity to the original. In other cases, however, the plaintiff argues that its experience shows that economic factors (principally the need for larger diameter pipe, to handle increased volumes of oil) or technical advances in its trade have caused it to abandon completely all or segments of the original line and its rights-of-way. The cost of the right-of-way is something less than 1% of the cost of constructing and laying a pipeline. Hence plaintiff argues that if the mileage may be decreased or other factors arise which may influence the construction of a line along a new route, the cost of the right-of-way is so minimal as not to be a determinative factor.

In denying that plaintiff may claim any depreciation of its primary trunk line rights-of-way, the government argues that plaintiff's experience is not sufficient to show a useful life thereof with any degree of certainty. The gov-

3. Treasury Reg. 118, promulgated under 1939 Code, 39.23(1); Treasury Reg. promulgated under 1954 Code, 1.167(a).

ernment emphasizes the fact that in a great majority of the cases where plaintiff has purchased its rights-of-way (as distinguished from those cases where it has been obliged to acquire same by condemnation), the grant or easement contains so-called "second" or "multiple line" rights. Under the terms thereof, the plaintiff is given the right not only to lay the initial pipeline upon payment of a relatively nominal consideration, but is permitted thereafter, usually on the payment of the same consideration, to lay a second or perhaps a third pipeline over the same easement. Thus the government argues that even if, after a period of perhaps 28 to 30 years, the particular pipe in a given line may have become useless, the right-of-way easement still has substantial value of the plaintiff, for under the original grant it may lay a new line parallel to the old. While, as stated, this usually calls for the payment of the same consideration as was required in laying the original line, nevertheless such second line rights have value in that the plaintiff is never required to condemn, and his negotiations and dealings with the landowner are almost uniformly less expensive and complex.

There is force to each argument. Further, there is support in the evidence for the position of each party.

The six primary trunk lines which the plaintiff has owned and utilized for transporting crude oil are described in the evidence as follows:

(1) the Cushing-Wood River 10-inch screwed line;

(2) the Cushing-Wood River 10-inch welded line;

(3) the Wood River-East Chicago line;

(4) the McCamey-Cushing line;

(5) the McCamey-Houston 10-inch line;

(6) the East Texas line.

Additionally, the plaintiff has owned an undivided interest in three other primary trunk lines referred to in the evidence as:

(7) the Ozark Pipe Line System from Cushing to Wood River;

(8) the Basin Pipe Line System from Jal, New Mexico to Cushing, Oklahoma; and

(9) the Rancho Pipe Line System from McCamey, Texas to Houston, Texas.

The plaintiff also has owned an undivided interest in a primary trunk line known as (10) the Bayou Pipe Line System carrying refined products from Houston, Texas to Baton Rouge, Louisiana.

*The Cushing-Wood River Lines*
*(Nos. 1, 2 and 7 above)*

The first of these lines, the screwed line (No. 1) from Cushing, Oklahoma to Wood River, Illinois, a distance of 430 miles, was constructed by Yarhola Pipeline Company in 1917–18. To increase the capacity of this line, various "loops" were placed in it in the period 1926–37. Ultimately, these loops were joined in such fashion as to constitute a second 10″ line (No. 2 above) parallel to the first. In 1949, plaintiff (in conjunction with another company) constructed an additional 22″ line (the Ozark pipeline, No. 7 above). The 10″ welded line (No. 2) was substantially parallel to the original 10″ screwed line (No. 1) in its entirety. The Ozark line was substantially parallel to the two older lines for a distance of approximately 350 miles (from the Wild Horse Pump Station, Oklahoma to Labadi Pump Station, Missouri). The remainder of the Ozark line was laid on a different right-of-way from the two 10″ lines. Where the three lines paralleled each other, substantial segments of the two later lines were laid under multiple line rights in the existing easements; some segments were laid under new easements; and still other segments were laid under multiple line rights which had been enlarged in width by the payment of an additional consideration to the landowner. When the 22″ line was put in service, one of the 10″ lines was re-

tired, this being comprised mainly of the 10″ screwed line, but including some portions of the 10″ welded line. The 22″ line and the second 10″ line remain in service. The retirement of this 10″ screwed line is one of the two retirements of primary trunk lines upon which plaintiff relies heavily as showing its history and experience in this field.

### The McCamey, Texas to Houston, Texas Lines (Nos. 5 and 9 above)

In 1930, the plaintiff completed the construction of a 10″ pipeline from McCamey, Texas to Houston, Texas (No. 5 above). In 1953, the plaintiff (in conjunction with several other companies) completed the construction of an additional 24″ line from McCamey to Houston, referred to as the Rancho Pipe Line System (No. 9 above). The new and larger line substantially paralleled the existing 10″ line from McCamey to near Bellville, Texas, a distance of approximately 390 miles. In this segment, substantial parts of the new and larger line were laid under second line rights in existing easement grants; some parts were laid under new easements, and still other parts were laid under additional line rights which had been enlarged in width by the payment of additional consideration to the landowner. From Bellville to Houston, a distance of approximately 60 miles, a new right-of-way was obtained for the new 24″ Rancho line. In 1953, on completion of the new 24″ line, the 10″ line was sold to others, for continued operation. Both lines are presently in service.

### The Wood River-East Chicago Line
### (No. 3 above)

This 8″ line was built by plaintiff in 1927 to supply a refinery in the Chicago area. In 1940, the refinery having been taken out of service, this line was sold by plaintiff to Shell Oil Company. The line was used by the new purchaser until it was dismantled in 1952. This is the second retirement of a primary trunk line to which plaintiff points as establishing its history.

### The McCamey-Cushing Line
### (No. 4 above)

This 10″ line was built by plaintiff in 1928. It is still in service.

### The East Texas Line
### (No. 6 above)

This 10″ line was constructed shortly after discovery of the East Texas oil field in about 1929–30. It is still in service.

### The Basin Pipe Line
### (No. 8 above)

This pipeline was constructed by plaintiff, together with three other companies, in 1948–49. It extends from Jal, New Mexico to Cushing, Oklahoma, and is in two segments. The first segment is from Jal to Wichita Falls, Texas, and the second segment from Witchita Falls to Cushing. The line varies in diameter from 20″ to 24″. From Westbrook, Texas to Archer, Texas, a distance of approximately 185 miles, it parallels a pre-existing line owned by the plaintiff. In that segment (from Westbrook to Archer), right-of-way was obtained by exercising multiple line rights in 350 existing easement grants, with the remaining right-of-way being obtained by securing 19 new easement grants. This line presently is in operation.

### Bayou Pipe Line
### (No. 10 above)

This line is of 8″ diameter from Houston to Port Neches; and of 10″ diameter from Port Neches to Baton Rouge. Built in 1942, it is still in operation.

Counsel advise me that while other cases deal with the depreciation of rights-of-way of gas pipelines, the question here is one of first impression as to oil pipelines. I consider this distinction of little, if any, importance. An examination of the earlier cases shows that while depreciation was allowed in a number of instances, in each case it was upon a showing that the source of supply would be depleted within a matter of years, and that upon the happening of that eventuality, the right-of-way would be of no further value. No such contention is

made here. The plaintiff does not contend that the sources of supply served by its primary trunk lines will be depleted in the foreseeable future. Thus, the case is one of first impression in this regard. Rather than basing its argument on the depletion of the source of supply, plaintiff argues that its experience, and that of the industry, shows that despite the value of second line rights when the life of the pipe in a line is exhausted, it frequently happens by reason of economic factors or advances in technology that a new location is selected, and the right-of-way, as well as the pipe, becomes valueless. Reaching the ultimate question, plaintiff argues that its proof shows that the life of the right-of-way may be calculated with sufficient certainty to qualify as a depreciable asset under the regulations mentioned above. The government's position is that the evidence does not show sufficient certainty for the right-of-way to qualify.

■ I find as a fact that inevitably plaintiff's right-of-way in each of its primary trunk lines eventually will become valueless; and, while the question is a close one and not free of doubt, I am of the view that the economic life may be shown with the "reasonable accuracy" required by Reg. 1.167(a)3 to permit the deduction.

The defendant relies primarily on Commissioner of Internal Revenue v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cir. 1965). There the court dealt with a claim for depreciation of a contract of affiliation held by the taxpayer with Columbia Broadcasting System; and reversed a decision of the tax court holding such contract depreciable. The contract provided for automatic periodic renewals, unless timely termination notice was given by one of the parties. The court found statistical data with reference to the number of cancellations of similar contracts by Columbia Broadcasting System to be unconvincing under the circumstances shown; that the prospects were the taxpayer's contract would increase in value, or at least would not be reduced in value over the years, and hence that it was not a depreciable asset. I do not consider this authority as particularly apposite.

Plaintiff relies primarily on Northern Natural Gas Co. v. O'Malley, 277 F.2d 128 (8th Cir. 1960). In *Northern Natural Gas*—perhaps the closest case in point —the court allows a depreciation deduction on the right-of-way easements of a gas pipeline. The court there discusses and considers all of the prior decisions. After citing the pertinent statutes and regulations (being those here involved), the court notes that the Supreme Court has held in Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 51 S.Ct. 262, 75 L.Ed. 594 (1931), and in United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054 (1927), that "a reasonable approximation" or a "rough estimate" of the depreciation to be allowed in a given year is all that the law requires.[4] While

---

4. The quotation from Burnet v. Niagara falls Brewing Co. is as follows:

"It would be unreasonable and violate that canon of construction to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient. Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." 282 U.S. at p. 654, 51 S.Ct. at p. 265.

The quotation from United States v. Ludey is as follows:

"The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed. The fact that the reserve is hidden from sight presents difficulties in making an estimate of the amount of the deposits. The actual quantity can

the stated basis of the court's opinion is the fact that the reserves owned by taxpayer (and upon which the life of the taxpayer's line was held to depend) were being exhausted from year to year, and hence depreciation was allowed on the estimated life of such reserves, nevertheless the evidence on this point was not convincing, as reflected by the dissenting opinion of Chief Judge Johnsen. Particularly pertinent is the statement found in the opinion of the court (277 F.2d at p. 138):

"Where a taxpayer shows he is entitled to some deduction but cannot definitely show how much, the court should not deny all deduction but should make as close an approximation of the deduction as it can." Citing authorities.

Shell also cites the unreported opinion of Judge Butzner of the United States District Court for the Eastern District of Virginia, dated November 22, 1966, in Commonwealth Natural Gas Corp. v. United States, 266 F.Supp. 298. There, following *Northern Natural Gas* the court allows depreciation on the right-of-way easements of a gas pipeline 350 miles in length. Again, the basis of the court's holding is the fact that the rights-of-way will be useful only for the transmission of gas by pipeline; and that the gas available for such transmission is limited in amount, and the period within which such supply will be exhausted and within which the rights-of-way will become valueless may be estimated with sufficient certainty to comply with the regulations. In this connection it is interesting to note that the parties stipulated that "all gas reserves and resources which are available or discovered east of the Rocky Mountains are a source of supply for the taxpayers' pipelines." In discussing the estimated life, the court states:

"Natural gas reserves are depleted by use, and such reserves will be avail-able for a limited time which can be estimated with reasonable accuracy. A life of twenty to twenty-one years based on the reserves-production ratio offers the appeal of a mathematical computation, but it is entirely too limited. It does not take into consideration the fact that gas has been discovered in the past and the expectation that gas will be discovered in the future. The minimum period of time, therefore, is approximately twenty years, but this is an unrealistic minimum. The maximum period of time, based on the resource base and the expectation that gas will be discovered and utilized in accordance with past trends is in excess of 100 years, but this is a speculative and unrealistic maximum."

From this it would appear—as in *Northern Natural Gas*—the court required little more than proof that the easements would ultimately be valueless, and required very little certainty as to the period within which this would come to pass.

Somewhat similar, and likewise cited by plaintiff is Union Electric Company of Missouri v. Commissioner of Internal Revenue, 177 F.2d 269 (8th Cir. 1949). There depreciation over a period of 100 years is allowed on easements of electrical transmission lines, and other properties of a hydroelectric plant. The basis for allowing the deduction was the estimation that a lake or reservoir, which constituted the source of water necessary for operation of the plant, would within 100 years become filled with silt and thus cause easements and other properties to become valueless for the purpose to which they were devoted.

While the stated basis of the holdings in these authorities is the exhaustion of the source of supply, I think it significant that the depreciation is al-

rarely be measured. It must be approximated. And because the quantity originally in the reserve is not actually known the percentage of the whole withdrawn in any year, and hence the appropriate depletion charge, is necessarily a rough esti-mate. But Congress concluded, in the light of experience, that it was better to act upon a rough estimate than to ignore the fact of depletion." 274 U.S. at p. 302, 47 S.Ct. at p. 610.

lowed even where scanty evidence to this effect has been offered. The net result appears to be only a showing that in fact the asset is a wasting one. If that be the case, the best evidence available would seem to be sufficient to meet the test. This is so, I suggest, because depreciation is an economic fact of life. If, in fact, the asset is of a wasting nature, it is fairer to the taxpayer, as well as to the tax collector, if recognition is given to this fact. Even though the margin of error in estimating the life of the asset ultimately is shown to have been a large one, the allowance of depreciation based on the best information available more accurately reflects the taxpayer's income than does a disallowance, coupled with the charge-off of a large capital asset during the single year of its retirement.

A further question not heretofore discussed is whether in considering the depreciability of plaintiff's rights-of-way its experience with its secondary trunk lines should be taken into account. It will be remembered that this distinction between the primary and secondary lines is plaintiff's own, maintained only for tax purposes. It is significant that the defendant conceded the depreciability of the secondary lines only on the morning of trial, and prior thereto had con-tested this item vigorously. Both the evidence, and common sense, show that in general the larger and the longer lines will remain in use for a greater period than the shorter and smaller lines. There can be little doubt that the 22″ and 24″ lines among those considered here will be in operation for many years to come. Their rights-of-way will continue to have value, particularly where two or more lines are laid upon the same easement. But just as surely, the smaller, the shorter, and the less profitable lines sooner will cease to have economic value, and they and their rights-of-way will be abandoned. Thus if plaintiff's experience in retiring its secondary trunk lines is considered, the plaintiff makes a far better showing. It may be that in determining a schedule of depreciation, the rights-of-way of the longer and larger lines should be depreciated at a lesser rate than the shorter and the smaller. Perhaps all should be lumped together and an average made of their estimated life. That question is not before me and is not decided. What is decided is that the plaintiff has sustained its burden of showing that the rights-of-way of its so-called primary lines are of use in plaintiff's business only for a limited time, and that the length of such use can be estimated with reasonable accuracy.