**COMMONWEALTH NATURAL GAS CORPORATION, Appellee,**

v.

**UNITED STATES of America, Appellant (two cases).**

**COMMONWEALTH GAS DISTRIBUTION CORPORATION, Appellee,**

v.

**UNITED STATES of America, Appellant (two cases).**

Nos. 11501–11504.

United States Court of Appeals Fourth Circuit.

Argued Dec. 8, 1967

Decided May 7, 1968.

William A. Friedlander, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, David O. Walter, Attys., Dept. of Justice, and C. Vernon Spratley, Jr., U. S. Atty., on brief), for appellant.

H. Brice Graves and Lewis F. Powell, Jr., Richmond, Va. (E. Milton Farley, III, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for appellees.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The district judge, in a trial non-jury, held that taxpayers, a natural gas pipeline company and a natural gas distributing company, were entitled to depreciate certain pipeline costs, i. e., the costs of easements, including damages and the costs of clearing and grading easements, over a 30-year useful life, and gave judgment for tax refunds. In these appeals the government contends that the evidence will not support 30 years as a reasonable estimate of the continued availability of a supply of natural gas, so that no depreciation for these costs should be recognized, or, alternatively, that depreciation over a 30-year period was improper, and that taxpayers' costs in clearing and grading easements should be ascribed to land, and hence, are not depreciable. We affirm the judgments from which these appeals are taken.

Commonwealth Natural Gas Corporation ("Commonwealth") transports natural gas by pipeline and sells the gas to retail distributors. It owns 350 miles of pipeline. Commonwealth Gas Distribution Corporation, a wholly-owned subsidiary of Commonwealth, owns 15 miles of pipeline and is a retail distributor of natural gas. By stipulation of the parties, all gas reserves and resources which are available or discovered east of the Rocky Mountains are a source of supply for taxpayers' pipelines, and the parties have stipulated, further, that taxpayers will receive their fair share of these reserves and resources. The tax years in question for both taxpayers were the years 1957 to 1960, inclusive.

Before turning to the main question of depreciation, we find it convenient to dispose of the subsidiary question of whether the costs of clearing and grading easements are depreciable items. These costs were incurred after acquisition of the easements in order to put the land in shape for the pipeline to be laid. Taxpayers argue therefrom that these costs constituted a part of the costs of the pipelines, depreciable as such. The government, however, contends that the costs of clearing and grading should be ascribed to the land, or the interest in land, and that depreciation, if any, would turn on that premise. The district judge assigned these costs to the pipelines themselves and not to the intangible easements.

Standard and regulatory accounting procedures require treatment of these costs in varying ways. The uniform system of accounts prescribed by the Federal Power Commission requires that these costs be charged to land and land rights accounts; the State Corporation Commission of Virginia previously had a like requirement, although it now recognizes that if such costs are incurred in connection with the construction of a pipeline they constitute a part of the costs of the line. "Accounting Research Study No. 7," published by the American Institute of Certified Public Accountants (1965) suggests that accounts for land and land rights should include the purchase cost of land and interests in land together with other incidental costs such as clearing and grading.

The only direct authority on the question is Portland General Electric Co. v. United States, 189 F.Supp. 290, 305 (D.Ore.1960), aff'd per curiam, 310 F.2d 877 (9 Cir. 1962), where it was held that the costs of clearing easements for electric transmission lines in order to construct the facilities were properly attributable to the costs of the facilities and depreciated as part thereof. See also, Algernon Blair, Inc., 29 T.C. 1205, 1220–1221 (1958), where the government conceded that the costs of clearing, grading and landscaping in building a multiple housing project were directly related to the construction of depreciable assets and were subject to depreciation. We are persuaded to follow the *Portland General Electric* case in the case at bar, and we hold that the costs of clearing and grading are attributable to the cost of constructing the pipeline and depreciable with it. Distinguishable is Meyer v. United States, 247 F.Supp. 939 (D.Mass.1965), aff'd per curiam, 362 F.2d 264 (1 Cir. 1966), which holds demolition costs a part of the cost of

site acquisition. The rationale of that holding is the prevention of tax avoidance because otherwise a part of the purchase price of the site would be allocated to the old building and a taxpayer would be entitled to an immediate deduction of the price so allocated upon demolition. There is no such consideration here.

We turn, therefore, to the main questions: are the costs of the pipeline depreciable, and is 30 years a proper period of depreciation?

Depreciation, as a deduction from gross income, is allowed by § 167 of the Internal Revenue Code of 1954.[1] The pertinent regulations are set forth below.[2] Through the successive codes and regulations thereunder there has been, over the years, little change in the provisions now obtaining. Essentially because the regulations say that an intangible asset "may" be the subject of depreciation if its length of life can be estimated with reasonable accuracy (notwithstanding that the statute says

"shall"), the government argues that "the cost of an intangible asset which is known to have a useful life of a limited or finite period may be depreciated *only* when the length of that period can be estimated with reasonable accuracy." By that measure, the government argues that the district judge's findings with regard to finiteness and 30 years as a reasonable estimate of useful life are not supported by the proof so that taxpayers' claimed depreciation should be disallowed.

Before analyzing the proof, we find it helpful to consider what the Supreme Court has said that the statute requires in order to entitle a taxpayer to sustain a deduction for depreciation. In United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054 (1927), the Supreme Court sustained the government's argument that a depreciation allowance must be made, even though the computation was based on a "rough estimate." At issue was the cost basis of certain oil reserves which were the subject of a sale;

1. Internal Revenue Code of 1954:
SEC. 167. DEPRECIATION.
(a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
(1) of property used in the trade or business, or
(2) of property held for the production of income.
* * * * *
(26 U.S.C. 1964 ed., Sec. 167.)

2. Treasury Regulations on Income Tax (1954 Code):
Sec. 1.167(a)-1. *Depreciation in general.*—(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable

property, equal the cost or other basis of the property as provided in section 167(g) and § 1.167(g)-1. * * *
(b) *Useful life.* For the purpose of section 167 the estimated life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * *
* * * * *

Sec. 1.167(a)-3 *Intangibles.*
If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * *
(26 C.F.R. Sec. 1.167(a)-3.)

it was held that the original cost of the property must be reduced by depreciation and depletion which Ludey was entitled to deduct, but did not claim, for earlier years.[3]

Four years later, in Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 51 S.Ct. 262, 75 L.Ed. 594 (1931), the test of "reasonable approximation" was approved as a test for obsolescence when the government argued that the effect of the prohibition amendment in the years immediately preceding its adoption in the brewing business could not be proved with sufficient certainty to support a deduction for obsolescence.[4]

■ The *Ludey* case was cited with approval as recently as 1966, in the case of Fribourg Navigation Co. v. Commissioner, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966), which also cited Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960), and Hertz Corp. v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960), as recognizing that "depreciation is based on estimates as to useful life and salvage value." Id., 383 U.S. p. 277, 86 S.Ct. at p. 866. Thus, it is clear that from the statute we must look to "estimates" which reasonably approximate what will occur; and, indeed, under certain circumstances they need be only "rough estimates." In recognition of the inexactness which may result

from resort to such sources—apparent during the useful life of the property being depreciated, at the termination of such life, or at the time of disposition of such property by sale—and which may become known by application of hindsight or by some future more exact knowledge, we must keep in mind the statement in the *Fribourg Navigation* case that "it is, of course, undisputed that the Commissioner may require redetermination of useful life or salvage value when it becomes apparent that either of these factors has been miscalculated." Id., p. 277, 86 S.Ct. at 865. On review, our present task is only to determine in the light of present knowledge for the tax years in question if the district judge correctly determined that taxpayers have established useful life by the prescribed tests.

The district judge made three ultimate findings that are before us on review: (a) natural gas reserves exist in nature in a finite amount, (b) natural gas reserves are depleted by use and such reserves will be available for a limited time which can be estimated with reasonable accuracy, and (c) the evidence demonstrated that 30 years was a reasonable measure of the life of the natural gas reserves available to the taxpayers for the tax years in question. The government does not contest the correctness of finding (a), nor does it contest the

3. " * * * The reserves are recognized as wasting assets. The depletion affected by operation is likened to the using up of raw material in making the product of a manufacturing establishment. As the cost of the raw material must be deducted from the gross income before the net income can be determined, so the estimated cost of the part of the reserve used up is allowed. The fact that the reserve is hidden from sight presents difficulties in making an estimate of the amount of the deposits. The actual quantity can rarely be measured. It must be approximated. And because the quantity originally in the reserve is not actually known the percentage of the whole withdrawn in any year, and hence the appropriate depletion charge, is necessarily a rough estimate. But Congress concluded, in the light of experience that it was

better to act upon a rough estimate than to ignore the fact of depletion." Id., 274 U.S. p. 302, 47 S.Ct. p. 610.

4. "It would be unreasonable and violate that cannon [sic] of construction to put upon the taxpayer the burden of proving to a *reasonable certainty* the existence and amount of obsolescence. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient. Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is properly chargeable in any period of time can be measured accurately. A *reasonable approximation* of the amount that fairly may be included in the accounts of any year is all that is required. * * * " Id. 282 U.S. p. 654, 51 S.Ct. p. 265.

correctness of the part of finding (b) that natural gas reserves are depleted by use and will be available for a limited time. The whole dispute revolves about whether the finiteness of natural gas reserves as to quantity and useful life can be estimated with reasonable accuracy and, if so, whether 30 years is an accurate estimate.

On these issues the taxpayers' entire case was predicated on the testimony of Dr. Bruce C. Netschert, an economist with geological training, who termed himself an energy and fuels economist. Dr. Netschert was established to be a man of extensive and impressive qualifications in the study and assessment of present and future supplies of energy in the United States, including oil and natural gas. *The government presented no evidence to controvert that adduced from Dr. Netschert.* While it does not attack his credibility as such, it relies solely on the answers elicited from him on cross-examination and what it considers the general unpersuasiveness of his testimony.

*We will not undertake to summarize or reproduce all of Dr. Netschert's testimony; a brief summary will suffice. Unequivocally, Dr. Netschert expressed the opinion that the useful life of natural gas reserves can be estimated with reasonable accuracy and is in the neighbor-* hood of 30 years. The latter portion of the opinion was derived from a consideration of the ratio of proved natural gas reserves to annual production (the "R-P ratio"). As a straight mathematical computation, the R-P ratio indicates 20 years.[5] This figure must first be adjusted downward because the initial rate of production is not maintained until exhaustion of a gas well; a gas well has a "deliverable life" of only 12 to 14 years. Conversely, the figure must next be adjusted upward because there are reserves other than proved reserves known to exist, although there is about their existence less certainty than proved reserves. These other reserves are of two types: "probable" or "possible" reserves which are known to exist but with less certainty than proved reserves and for which there has never been any compilation of reserves data on a state, regional or national basis, and gas that is presumed to exist but has as yet not been discovered although some will certainly be discovered. Taking into consideration the adjustments which must be made to the R-P ratio and "the matter of technology," Dr. Netschert's opinion was that 30 years useful life was a reasonable net result. His own explanation of his ultimate opinion was best expressed in response to a question by the Court, set forth in the margin.[6]

5. Before this ratio is computed, gross production must be adjusted because some of the gas produced is reinjected into the ground and not consumed. Of the gas considered to be consumed, some is wasted or lost. Another factor which affects blind resort to the ratio is that some of the proved reserves are unrecoverable because of economic or physical circumstances.

6. " * * * *

The Witness: Well, I think that is necessary to take into account three things.

On the one hand the overstatement of the life of reserves that is inherent in the R–P ratio because of this matter of deliverability, as I explained in my testimony.

In the second place it is necessary to take into account the conservativeness of the R-P ratio because it uses proved re- serves whereas we know that there are other categories of reserves in addition.

And on the third point I think it is necessary to consider the matter of technology on the consumption side as well as the production side. That is, I have testified repeatedly on the fact that there are, I think, a great deal, a great, very large quantities of gas remaining in this country. I have further testified that I think that this gas will or can be made available through technological improvement, through continued technological improvements in the matter of finding and producing it.

Now, in this context in which I testified, as I understand it, it would be appropriate to consider not only that but also the technology as to the effects, the other side, the consuming side. And that is

498

The basis for Dr. Netschert's opinion is attacked by the government on two scores. First, it is claimed that the aspect of his testimony, wherein he admitted that in addition to proved and probable reserves there is gas presumed to exist but not yet discovered although some will certainly be discovered, destroyed the basis for his conclusion. This is so, it is argued, because there is clear recognition that the supply of gas will last beyond 30 years and, failing a reasonable estimate of how long the supply will last beyond 30 years, taxpayers have failed to meet the burden imposed on them to prove the reasonable accuracy of the claimed deduction. The answer to the argument is that the gas referred to has not yet been discovered. While there may be a degree of certainty that it will be discovered, when and in what quantities cannot be presently predicted. Until there is more certainty as to when and in what quantities these reserves of gas will be ascertainable quantities, they may not be given an existence such as to destroy the Congressional mandate that a depreciation deduction "shall be allowed." In this regard we are persuaded by the majority and concurring opinions in Northern Natural Gas Company v. O'Malley, 277 F.2d 128 (8 Cir. 1960), a case on all fours with the instant case, which upheld a depreciation allowance. The comment of Judge

Blackmun in his concurring opinion on this point is pertinent:

"The Commissioner's insistence in this case that there be a fixed and definitely limited period of time must equate only with the practical need of a measure. But that measure need not be one determined with precision accuracy and be good for all time. A 'reasonable approximation' or even 'a rough estimate', say the Niagara Falls and Ludey cases, is enough. In this light, the elements involved here, namely, proven reserves, production, reserve life index, load factor and the others, become acceptable for consideration in the absence of proof that they are wholly fallacious. These elements at first glance may seem to be difficult of application, but, if so, the difficulty bears upon only computational aspects and not upon basic eligibility. The amount of the deduction will change from year to year as proven reserves change and as additional costs of rights-of-way may be incurred. These changes are only computational but, when properly taken into account, they prevent the complete consumption, through deductions, of rights-of-way costs before the end of the rights-of-way life. There is thus no premature recovery of these costs." Id., p. 140.

See also, Shell Pipe Line Corp. v. United States, 267 F.Supp. 1014 (S.D.Tex.1967).

where I talk about the all-electric economy.

Now, taking all those things into account, we have a given figure, an actual specific figure in the neighborhood of 20, as an indicated life in the R–P ratio.

We have an indication of, fairly good indication, that there are other quantities of gas which would make the actual figures somewhat higher. These quantities, however, cannot—or specific measures of these quantities are not available. There are no figures equivalent to the, equivalent to the proved reserves figures having to do with these additional quantities of gas.

There are estimates, but they are not estimates made on the same basis or consistent among different estimators, et cetera.

So we have a fairly solid figure on the one hand, which is clearly at the low end. The question, then, is how far do we go toward the high end. That is what, if you took for example, the figure such as I myself have used, that there were at least twelve hundred trillion cubic feet of reserves, or rather of gas, probably exist in the earth's crust in the United States, this would give you a ratio of something close to 100 by dividing the current production into it. However, this involves this matter of technology, as I have said, and considering the possibilities on both scores it seems to me that a reasonable net result is in the neighborhood of thirty years."

The second ground of attack on the testimony of Dr. Netschert is its reference to an all-electric economy. It is argued that the witness predicated his opinion at least in part by theatened obsolescence and that this constituted a fatal variance in taxpayers' cases under the familiar rule that a taxpayer may litigate his taxes only on the grounds that were presented to or considered by the Commissioner.[7] Samara v. United States, 129 F.2d 594, 597–598 (2 Cir.), cert. den., 317 U.S. 686, 63 S.Ct. 258, 87 L.Ed. 549 (1942).

The short answer to this argument is that when the testimony of Dr. Netschert is considered in its entirety, it does not appear that he predicated his testimony on obsolescence occasioned by competition from electricity. Dr. Netschert did say that in arriving at a 30-year useful life he considered "the matter of technology." "Matters of technology" included improvements on the consumption side (in new and increased uses of gas) and improvements on the production side (in finding and producing gas), and he was quite clear that "we have a more or less 20–25 year generation life of technology," and that to "go beyond this period very far you begin to get into an area where all possibilities are open and where you have almost nothing to

go on." It was in connection with matters of technology that the witness speculated that there might be the all-electric economy by the end of the century and that by then "the natural gas industry would be * * * as obsolete as the buggy whip industry is today." That increased use of electricity was a factor to be considered along with other factors, but that the conclusion of a 30-year life was not based on obsolescence, best appears from the witness' own words, set forth below.[8]

██ Our review of the record satisfies us that the findings of the district judge were amply supported, particularly in view of the fact that he judged credibility by observance of manner and demeanor of the expert witness in testifying, and the inherent persuasiveness of his testimony without any evidence to controvert that testimony. We consider that the quantum and quality of that testimony satisfied the tests of what is needed to demonstrate entitlement to a deduction for depreciation. It follows that the allowance of a depreciation on the basis of a 30-year useful life for the tangible and intangible personal property in question for the years in question was correct. The judgments appealed from are

Affirmed.

7. A related argument is that taxpayers stipulated that as yet undiscovered gas reserves would constitute a source of supply for them. Neither we nor the district judge read taxpayers' stipulation so broadly.

8. "For several reasons, one of which I have already alluded to earlier, the concept that we have a more or less 20, 25-year generation life of technology, that when you go beyond this period very far you begin to get into an area where all possibilities are open and where you have

almost nothing to go on. Whereas, here, for this period, you have, as the basis, the beginning R–P ratio. You have in addition the knowledge that there are certain unspecified, unmeasured, quantities of reserves in beyond the proved reserves and you have the indicated forces at work in the matter of the use of gas versus electricity, as well as the trend at present toward increased gas use. And it is the balance of all of these that I think is properly represented by a period of 30 years."