Per Curiam :
These cases were referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The Commissioner has done so in an opinion and report filed on April 29,1968. On May 28, 1968 defendant filed a notice of intention to except to the Commissioner’s findings of fact and recommended conclusion of law. On August 12, 1968 defendant filed a notice of withdrawal of the notice to take such exceptions. On August 20,1968 plaintiffs filed a motion requesting the court to adopt the Commissioner’s recommended opinion, findings, and conclusions of law. Since the court agrees with the Commissioner’s opinion, findings, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases without oral argument. Plaintiffs are, therefore, entitled to recover and judg *572 ment is entered for plaintiffs with the amounts of recovery to be determined pursuant to Rule 47 (c).
OPINION OP COMMISSIONER
Willi, Commissioner:
Plaintiffs are both Delaware corporations who operate as interstate carriers of petroleum and petroleum products by pipeline.
The issue presented in these cases is the same as that decided today in Badger Pipe Line Co. v. United States, ante, at 547, with which these cases were consolidated for trial under Rule 47(a). Although many of the particular facts involved in these cases, detailed in the findings accompanying this opinion, differ from those presented in Badger, their net effect is the same and so, therefore, is the decision rendered herein. Accordingly, for the reasons stated in Badger, these plaintiffs are entitled to depreciate their capitalized easement acquisition costs in the same manner as the line pipe to which those easements relate.
Whereas Badger was engaged solely in the trunkline transportation of refined products, Texas-New Mexico transported only crude oil, both in gathering lines and trunklines. The bulk of Texaco-Cities Service’s business was the trunk-line transportation of crude, with only the small remaining balance involving the trunkline movement of refined products. It had no gathering lines.
On brief, the Government concedes the depreciability of New Mexico’s gathering line easement costs on the basis of the limited production life of the oil deposits from which they draw. It may be noted that the Internal Revenue Service’s Bulletin “F” recognizes a shorter useful life for pipe used in a gathering line than for pipe in a trunkline, i.e., 25 v. 40 years. See Badger, supra, n.3.
As to the trunklines that comprise the remainder of both plaintiffs’ systems, the Government’s position is the same as that advanced in Badger; that the capitalized costs of the related easements constitute intangible assets that may not be depreciated because their useful life is indeterminate. As in Badger, the Government urges that the indefiniteness of easement useful life results from the plaintiffs’ rights thereunder to (1) replace the pipe that is initially installed; and *573 (2) in some instances, to lay an additional line in the right-of-way upon payment of the same roddage fee as specified for the original line.
The evidence in these cases shows, as it did in Badger, that these rights are more theoretical than real. Specifically, it is no more economically feasible for these plaintiffs, than for Badger, to effect pipe replacement for other than localized repair purposes. The right to repair a line by pipe replacement does not render the useful life of the associated easements any more indeterminate than it does the life of the line pipe itself. It has never been suggested that the right of replacement defeats the tax privilege of depreciating the tangible components of the line. The unavoidable consequence of extended service interruption makes wholesale pipe replacement to increase system capacity economically prohibitive.
As to the residual value of such additional line rights as are involved in these cases, the record shows that as a matter of policy, plaintiffs did not enforce the roddage fee provisions of such rights so as to secure any discernible savings in the construction of a new line. Consequently, the existence of such previously acquired rights did not have a governing influence on the routing of additional line construction. As held in Badger, the potential benefit of avoiding condemnation proceedings in the acquisition of a portion of the rights-of-way that might be utilized in the future for additional line construction, is simply not enough to upset the generally evident conclusion that the income-producing value to the plaintiffs of the easements that they purchased is tied directly to that of the installed pipe for which they were acquired.
The requirements of the statute and regulations controlling plaintiffs’ easement depreciation rights are not so stringent that such rights are denied unless it can be shown that at a specified time every vestige of value, real and hypothetical, will be gone.
To sustain the right to depreciate, the taxpayer’s burden in forecasting useful life is no greater where the asset in question is intangible rather than tangible. In either event, if a realistic assessment of the present and foreseeable facts relevant to a projection of the asset’s productive useful life *574 points to a discernible terminal date of its income-producing value to its owner, its cost may be deducted for tax purposes over that period. Moreover, to depreciate the intangibles here involved, it is not necessary for the taxpayer to establish a specifically limited useful life for those assets standing alone. Rev. Rul. 65-264, 1965-2 Cum. Bull. 53, provides that the useful-life burden has been met if the taxpayer can show that, whatever it may be in terms of years, the economic life of the intangible easement is directly related to that of a tangible asset such as the associated pipeline. The evidence in these cases clearly establishes the requisite correlation. That correlation, the evidence shows, is not significantly disturbed by the pipe replacement and second line right features of the easements. Accordingly, any subsisting claim that easement life is indeterminate necessarily amounts to an attack on the generally accepted useful-life attributes of the pipeline itself. That issue has not been raised in these cases.
It is held that on the facts here involved, the useful life of plaintiffs’ easements is the same as that of the installed pipe for which they were acquired, with the cost thereof to be depreciated at the same rate as has been applied by the parties in the case of the related pipe.
FiNdings of Fact
1. Texas-New Mexico Pipe Line Company (hereinafter called “New Mexico”) is a Delaware corporation organized in 1937. Throughout 1956 and 1957, the years in suit as to both plaintiffs, its sole business was the interstate transportation of crude oil by pipeline as a common carrier subject to the jurisdiction of the Interstate Commerce Commission. It owned none of the oil that it carried and was not engaged in the production of oil or gas and had no interest in any oil or gas-producing property. Its 120,000 shares of issued and outstanding capital stock were held as follows:
54,000 shares by The Texas Company
42,000 shares by Sinclair Pipe Line Co.
12,000 shares by Empire Gas & Fuel Co.
12,000 shares by Tidewater Associated Oil Company
*575 In 1956, 22 percent of the oil carried by New Mexico was owned by persons other than its shareholders, and in 1957 the figure was 18 percent.
2. New Mexico employed approximately 300 people who manned its pipeline system on a daily basis. All administrative and executive supporting services were furnished under contract by Texaco Inc. and the Texas Pipe Line Company, its wholly owned subsidiary.
3. New Mexico transports no refined petroleum products. Its total system, consisting of both gathering lines and trunk-lines, is comprised of four separate segments as follows:
(1) The Colorado City system, which was placed in service in 1950. This system gathers crude oil from leases in Howard, Borden, Kent, Dawson, and Scurry Counties, Texas; and delivers it to Colorado City, Texas.
(2) The New Mexico-Houston system, which was constructed in 1929 by a predecessor of the plaintiff and was acquired by the plaintiff in 1937. This system gathers crude from leases in Chaves, Eddy, and Lea Counties, New Mexico; Andrews, Caldwell, Cochrane, Crane, Crockett, Ector, Gaines, Guadalupe, Pecos, Upton, and Winkler Counties, Texas; and delivers it principally at Jal, Mesa, and Houston.
(3) The Sundown-Midland and Crane-Midland system. The Sundown-Midland segment was constructed in 1940, and the Crane-Midland segment in 1953. This system gathers crude from leases in Dawson, Plockley, Martin, Midland, Terry, Crane, and Upton Counties; and delivers it to the Basin and connecting systems at Midland, Texas.
(4) The Aneth to Jal system was constructed in 1957 and 1958. It gathers crude in San Juan County, Utah; and delivers it to Jal, New Mexico.
4. New Mexico’s system is interconnected at a number of points with the lines of other pipeline carriers.
5. Texaco-Cities Service Pipe Line Company (hereinafter called “Cities Service”) is a Delaware corporation organized in 1928. During 1956 and 1957, Cities Service’s sole business was the interstate transportation of crude oil and refined products by pipeline as a common carrier subject to the jurisdiction of the Interstate Commerce Commission. It *576 owned none of tbe oil that it carried and was not engaged in tbe production of oil or gas and bad no interest in any oil or gas-producing property. Its issued and outstanding capital 'stock was owned 50 percent by Tbe Texas Company (now known as Texaco Inc.) and 50 percent by Empire Gas & Fuel Company whose stock has since been acquired by Cities Service Oil Company.
In 1956, 31 percent of tbe crude and refined products carried by Cities Service was owned by persons other than its shareholders. In 1957, tbe figure was 28 percent.
6. During the years in suit, Cities Service employed approximately 250 people who manned the daily operation of its system. As in the case of New Mexico, Cities Service received all administrative and executive supporting services under contracts with Texaco Inc. and its wholly owned subsidiary, the Texas Pipe Line Company.
7. The Cities Service system, which included no gathering lines, consisted of the following 10 separate segments of crude and refined products trunklines:
(1) Cushing, Oklahoma, to Wilmington, Illinois, a distance of 592.53 miles: a 12-inch line, which was originally placed in operation in 1929 and which has been augmented by a second 12-inch line from Seldar, Kansas, to Wilmington, Illinois; receives crude at Cushing, Oklahoma; and makes deliveries through lines of various sizes to several refineries and terminals in the vicinity of Chicago, Illinois, principally at Lockport, Illinois, and East Chicago, Indiana.
(2) Mattoon, Illinois, to Hey worth, Illinois, a distance of 62.4 miles: an 8-inch line, which was placed in operation in 1929; receives crude from Cook Mills and Mattoon Fields for delivery through the 12-inch line to the area of Chicago, Illinois.
(3) Wichita-Valley Center, Kansas, to Sheldon, Missouri, a distance of 186.6 miles: a 10-inch line, which was placed in service in 1936; receives crude from the producing fields in Kansas for delivery through the 12-inch line to the area of Chicago, Illinois.
(4) Salem, Illinois, to Heyworth, Illinois, a distance of 108 miles: a 10-inch line, which was placed in service in *577 1939; receives crude from the producing fields in the Salem, Illinois, area for delivery to the area of Chicago, Illinois.
(5) Patoka, Illinois, to Wilmington, Illinois, a distance of 179 miles: an 18-inch line, which was placed in operation in 1949; receives crude from the Basin-Ozark system, for delivery to the area of Chicago, Illinois..
(6) Cushing, Oklahoma, to West Tulsa, Oklahoma, a distance of 47 miles: a 10-inch line, which was placed in service in 1949; receives crude from the Basin system for delivery to Texaco’s refinery at Tulsa, Oklahoma.
(7) Cheney, Kansas, to Haven, Kansas, a distance of 13.6 miles: a 4-inch line, which was placed in service in 1951; receives crude in the Cheney, Kansas, area for delivery to a connecting carrier at Haven, Kansas.
(8) West Tulsa, Oklahoma, to Cushing, Oklahoma, a distance of 47 miles: an 8-inch products line, which was placed in operation in 1955; transports refined products from Texaco’s West Tulsa Kefinery to a connecting carrier.
(9) East Chicago, Indiana, to Lowell, Michigan, a distance of 170.58 miles: a 6-inch line, which was placed in service in 1957; transports liquid petroleum gases from refinery in East Chicago to South Bend, Indiana, and Lowell, Michigan.
(10) Seminole, Oklahoma, to Cushing, Oklahoma, a distance of 57.4 miles: a 10-inch line, which was acquired in 1929; receives crude from the Seminole area for delivery into the system at Cushing.
8. Cities Service’s lines interconnect with the lines of other pipeline carriers at various points.
9. In the construction of pipeline systems such as the plaintiffs’, it is necessary to utilize the lands of others. Access to such lands was secured by obtaining right-of-way privileges, in the form of both grants and permits, from the property owners involved. The Cities Service pipeline system utilizes between 3,000 and 3,500 separate right-of-way agreements, and the New Mexico system, between 2,500 and 3,000 such agreements.
10. In those instances where plaintiffs’ lines traversed lands owned by railroads, state, county, or municipal authorities, and federal lands administered by the U.S. Department *578 of Interior’s Bureau of Land Management, rights-of-way were obtained in the form of permits which generally provided for payment of an annual fee to the property owner. To the extent that such permits are involved in plaintiffs’ systems, their expenditures incident thereto have been properly charged to current expense for federal tax purposes and are therefore not involved in this litigation.
11. The concern of this litigation is with respect to those right-of-way easements whose terms run for as long as the line or lines installed thereunder are operated or maintained in operable condition. Such easement rights, obtained from private landowners and various Indian tribes, were acquired by payment of a lump-sum consideration, generally described as a roddage fee, by plaintiffs. For federal tax purposes, plaintiffs capitalized all expenses incurred for the acquisition of such easement rights and the issue in dispute is whether plaintiffs may claim annual depreciation deductions in respect to such sums for purposes of determining their federal income tax liabilities.
12. Approximately half of the easement indentures described in the preceding finding contained clauses whereby, upon payment of the same roddage fee specified for the original grant, plaintiffs could install a second line, or in some instances additional lines, on the same right-of-way.
13. The term “roddage fee” used in finding 11, above, representing payment for the initial right-of-way, includes the right of entry, the right of ingress and egress for the purpose of maintenance and repair, the right to operate, and the severance damages (the difference in the value of the land due to laying the pipeline).
14. As noted, the easements described in finding 11, above, continued in force for as long as plaintiffs operated the lines installed thereunder or maintained them. The maintenance referred to consisted of cleaning the inside of the line with a scraper, filling it with water containing a rust inhibitor and then capping the line, patrolling the route of the line by airplane to observe any ground conditions or activity that would be detrimental, and maintaining the cathodic protection units that prevented electrolytic action from *579 damaging the pipe. In addition, any relocation necessitated by highway or navigation improvement projects was done.
15. Substantial portions of New Mexico’s lines traversed Indian lands of the Navajos, Utes, Zias, and Apaches. Cities Service utilized Indian lands to a far lesser degree. The right-of-way agreements with the Indians were unique in several particulars. They generally required that Indians be employed in the construction and maintenance of the pipeline. They included a hold-harmless clause under which plaintiffs assumed the repair cost of any damage caused the line by Indians. They required plaintiffs to relocate their lines whenever relocation was deemed to be in the interest of the Indians. Finally, these agreements did not include any second or additional line rights.
16. In acquiring the rights-of-way that extended beyond a specified term, plaintiffs employed a formula by which they derived the roddage fee that they offered the property owner for easement rights. They appraised the total value of the landowner’s property and ratably allocated that value to the acreage covered by the proposed easement. They then negotiated with the property owner on the basis of 60 to 80 percent of the full aliquot value of the easement property involved. Ordinarily the so-called construction damages, i.e., damages to crops, fences, and land caused by actual construction operations, were separately settled with the property owner after the line had been installed.
17. In negotiating for easement rights of the type described in finding 11, above, it was standard practice for plaintiffs to offer the property owner a form of agreement that included a clause giving the carrier the right to install a second or additional line upon payment of the same rod-dage fee specified for installation of the initial line. If the property owner objected to inclusion of such a provision, it was stricken from the agreement. Plaintiffs offered the landowner no more for an easement grant that included this provision than for one that did not.
18. Over the years, the costs of acquiring pipeline rights-of-way have increased, due in large part to the general increase in property values.
*580 19. Plaintiffs included a second or additional line right clause in the standard form of easement agreement tendered property owners as a means of facilitating any negotiations that might be necessary in the future if it became necessary or expedient to utilize the same right-of-way tract for the installation of an additional line. The real benefit to the carrier of obtaining an additional line right as a part of the initial easement grant is that it avoids the possibility of having to resort to condemnation proceedings in the future with the property owner in question or his assigns. Though plaintiffs have the right of eminent domain, they rarely use it because of its time-consuming nature and unfavorable public relations aspects. These considerations have a significantly greater influence on plaintiffs’ established policy of avoiding condemnation than does the factor of possible added expense.
20. Though not specified in the agreements containing additional line clauses, plaintiffs have uniformly construed such a provision as entitling them to install another line no further than 10 feet, pipe center to pipe center, laterally distant from the original line. If the distance is greater than that, a new and separate right-of-way is purchased.
21. In order to provide uninterrupted service during major repair operations, pipeline companies quite often add a so-called loop line to a particular pipeline. A loop line is a new and additional line, generally running adjacent and parallel to the first line. It connects into the first line ahead of and beyond the portion of the original line that is being repaired or replaced. Although the loop line may be technologically superior to the line that it is looping, its capacity is limited by the looped line’s pressure and size.
22. When a pipeline carrier desires to significantly increase existing transportation capacity between two points, it will ordinarily construct a so-called parallel line. Operationally, such a line is completely independent of the preexisting line between the points involved. Because of this separateness, service continuity between the points is maintained by the uninterrupted use of the old line during construction of the new. Such continuity could not be obtained if capacity were to be increased by removing the old *581 line and replacing it with, a larger one in the same trench. Because of the economic necessity of service continuity, such a procedure would only be employed in the most exceptional circumstances. Usually such circumstances would involve a congested urban area where no other reasonable alternative was available. Plaintiffs have not done this, and the evidence does not indicate that they will be compelled to do so in the foreseeable future.
23. When a carrier determines to increase transportation capacity between two existing service points by installing a second line, the planned routing for that line is not significantly influenced by the existence of second line rights associated with the original line whose capacity is to be augmented. This is true primarily, because right-of-way acquisition costs represent such a negligible portion, not over 6 to 7 percent, of the total cost of constructing a pipeline. Moreover, utilization of second line rights achieved no discernible economy in right-of-way cost because of plaintiffs’ invariable policy of paying the currently prevailing roddage fee for the location in question, even though that fee might be significantly higher than that specified in the original easement that included a second line clause. This policy is based on plaintiffs’ strong desire to gain and retain the goodwill of the property owners whose lands are traversed by plaintiffs’ systems. This is important not only to facilitate access during the construction period but because of the periodic necessity thereafter to go on the property owners’ lands for maintenance and repair operations. In any event, the prime considerations in routing a parallel line are the quantities of pipe required and the physical characteristics, natural and man-made, of the lands to be crossed. The object is to balance these two costs in a manner that will produce the lowest total construction cost for interconnecting the intended service points. Plaintiffs have never resorted to litigation to enforce a second line right.
24. When Cities Service laid a second line from Sheldon, Missouri, to Chicago, a distance of approximately 440 miles, it utilized second line rights for only 60 percent of the distance even though it held such rights for 75 percent of the distance. In those instances where second line rights were *582 used, the property owner was nonetheless paid the currently prevailing roddage rate.
25. Both plaintiffs have acquired a few right-of-way easements by condemnation. They regard this procedure as extremely undesirable, however, because of its time-consuming nature and its tendency to produce adverse public relations.
26. Pipeline construction costs vary with the type of area (open, medium, congested) in which the line is located. Costs in medium congested areas are one-third to one-half greater than in open country, and in congested areas the cost might well be double, or more.
27. Rights-of-way are only purchased for a specific pipeline project; never for investment and later sale. Although rights-of-way are conventionally assignable by a grantor in connection with a sale of its system on a going-concern basis, there is no known established market dealing in rights-of-way.
28. Replacement of line pipe is only done to effect localized repairs to the line. When a segment of trunkline is taken out of use, it is kept in a maintained status (see finding 14, above) for approximately 2 years. If it then appears that the segment will not be of further use, it is abandoned. Depending upon the economics of the situation, the pipe will either be removed or arrangements are made with the affected property owners to leave it in the ground. In either event, all easements involved are formally released. Gathering lines may be kept in a maintained status for longer than a 2-year period because of the possibility of improved technology by which the wells or fields serviced by them may be restored to production. At such time as gathering lines are abandoned, the disposition of the rights-of-way in question is the same as previously described in the case of trunk-lines. Accordingly, rights-of-way have neither salvage value nor marketability after the close of the service life of the pipeline system to which they relate.
29. Plaintiffs are subject to the jurisdiction of the ICC, and are required to follow the Uniform System of Accounts for Pipe Line Companies for accounting purposes. Order 19200 of the ICC, 205 ICC 33 (November 13,1934), required *583 depreciation accounting by pipeline carriers. The order classified rights-of-way as depreciable investment. The Uniform System of Accounts, issue of 1952 (prescribed by the ICC), prescribed depreciation accounting for pipeline companies and designates rights-of-way as depreciable assets. In Suborders Nos. P-15-B and P-46-B, dated December 9, 1954, the ICC set forth the depreciation rates to be used by the plaintiffs for depreciation of their rights-of-way. The rate set for Cities Service in Sub-order P-15-B was 3.35 percent for trunklines. The rate set for New Mexico in Sub-order P-46-B was 3.68 percent for trunklines and 8.33 percent for gathering lines. These determinations were the result of proposals by plaintiffs and other carriers to the ICC, and were apparently based on information furnished by the carriers to the ICC. The record here does not include admissible evidence of any of the factual considerations on which the ICC premised its conclusions. The record does show, however, that the right-of-way indentures were not furnished to the ICC and were not considered by it in making its determinations.
30. On their federal income tax returns for the years in suit plaintiffs claimed no depreciation in respect to their capitalized easement acquisition costs. For the years indicated, the beginning and ending balances of such costs were as follows:

Texaco-Cities Service Pipe Line Company

Year Beginning End of year of year
1956 (Trunklines).$1,093,407 $1,095,891
1957 (Trunklines). 1,095,891 1,504,085

Texas-New Mexico Pipe Line Company

Year Beginning End of year of year
1956 (Gathering Lines) $256,218 $300,121
(Trunklines)_ 316,858 332,164
(Total). 573,076 632,285
1957 ~'(Gathering Lines).. 300,121 348,989
"(Trunklines).. 332,164 340,200
(Total) 632,285 689,189
*584 31. For the years in suit, both plaintiffs underwent Internal Revenue Service audits that included an examination of their depreciation practices. For the period involved, these audits culminated in agreements as to both plaintiffs’ allowable depreciation deductions in respect to expenditures for line pipe, fittings, and pipeline construction.
32. On June 9,1960, and June 2,1961, New Mexico timely filed claims for refund of income taxes for the years 1956 and 1957, respectively, alleging overpayments in the amounts of $14,912.17 for 1956 and $16,251.49 for 1957, resulting from its alleged entitlement to depreciation on its capitalized investment in pipeline rights-of-way. These refund claims were formally rejected by the Commissioner of Internal Revenue and the present suits followed.
33. On June 9,19,60, and June 2,1961, Cities Service timely filed claims for refund of income taxes for the years 1956 and 1957, respectively, alleging overpayments of income taxes in the amounts of $20,093.38 for 1956 and $26,323.29 for 1957, resulting from its alleged entitlement to depreciation on its capitalized investment in pipeline rights-of-way. These refund claims were formally disallowed by the Commissioner of Internal Revenue and the present suits followed.
Ultimate Finding
34. Plaintiffs’ rights-of-way, with or without additional line rights, are directly and completely interrelated to the particular pipelines for which they were acquired. They have no measurable use or value separate and apart from such lines. The rights-of-way do not contribute to the production of income independently of their association with the line. Right-of-way acquisition costs become an integral part of the pipeline system for the construction of which they were incurred and to which they relate; the useful lives of the two for federal income tax depreciation purposes are coterminous.
Conclusion op Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiffs *585 are entitled to recover and judgment is entered to that effect. The amounts of recovery are reserved for further proceedings under Rule 47 (c).
In accordance with the opinion of the court, memorandum reports of the commissioner and stipulations of the parties, it was ordered on December 16,1968, that judgments for the plaintiffs be entered as follows:
Nos. 51-63 and 345-64_$33, 601.36
Nos. 52-63 and 374-64_ 46,416. 61
together with interest thereon as provided by law.