SPARTANBURG TERMINAL COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3475-73.    Filed August 30, 1976.

*George K. Dunham,* for the petitioner.
*Donald W. Williamson, Jr.,* for the respondent.

IRWIN, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income tax:

| Year ended | Deficiency | Year ended | Deficiency |
|---|---|---|---|
| 12/31/64 | $28,688.42 | 12/31/66 | $64,236.63 |
| 12/31/65 | 71,531.50 | 12/31/67 | 40,641.82 |

The parties have made several concessions, leaving for our resolution only the issues: whether petitioner is entitled to depreciation deductions with respect to certain costs of constructing a railroad tunnel; whether an investment credit is allowable with respect to these costs; and whether an investment credit is allowable with respect to the costs of installing fences and gates to prohibit trespassers from entering the tunnel or upon the tracks.

### FINDINGS OF FACT

Some of the facts have been stipulated and, except as noted in footnote 5 *infra,* are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Spartanburg Terminal Co. is a South Carolina corporation with its principal office in Jacksonville, Fla. For the taxable years 1964 through 1967, petitioner filed its Federal corporate income tax returns with the District Director of Internal Revenue in Jacksonville, Fla.

Petitioner was organized in September 1953 for the purpose of constructing and operating a railroad tunnel and connecting tracks in Spartanburg, S.C. The tunnel and connecting tracks connected existing lines belonging to Atlantic Coast Line Railroad (now Seaboard Coast Line Railroad), Clinchfield Railroad Co., and Piedmont & Northern Railroad Co. Previously, such connections had been made over nearby tracks belonging to the Southern Railway Co. The tunnel was constructed underneath the Southern Railway Co. tracks and surface streets in downtown Spartanburg, S.C., and formed an important link in the Atlantic Coast Line (now Seaboard Coast Line) rail system. Construction of the tunnel made use of the Southern Railway tracks (and the costs incident thereto) no longer necessary.

Atlantic Coast Line Railroad Co. owned 75 percent of petitioner's outstanding stock with the remaining 25 percent being owned by Louisville & Nashville Railroad Co. for all the years relevant to this litigation. Atlantic Coast Line Railroad also owned a controlling stock interest in the Louisville & Nashville Railroad Co. during all relevant years.

Petitioner's tunnel was in the planning stage for many years (possibly since 1908) before construction commenced in 1962. Construction was completed in July 1963 and the tunnel placed in service at that time. The total cost of the tunnel project was $2,637,508.71.

The tunnel was constructed on an easement acquired from the Southern Railway Co. after extended litigation and condemnation proceedings. The record does not indicate the length of time over which the easement extends.

Construction began by first clearing and grading the approach sections at each end of the tunnel. The northern approach section is approximately 2,000 feet long and the southern approach section approximately 1,400 feet long. The tunnel itself is just under 800 feet long.

The approaches were constructed by the "cut and fill" method of excavation whereby earth was removed to create a gradually

descending roadbed from the original ground level down to the tunnel floor. Some of the earth removed was used to "fill" in portions of the natural ground line which fell below the desired roadbed level, but most of the excavated dirt was hauled away from the construction site altogether.

The tunnel itself was constructed by using both the "cut and cover" and "driven" methods of construction. The "cut and cover" method of construction consisted of driving sheet metal into the ground to form a rectangular cell. Earth was then removed from the rectangular cell down to the desired level of the tunnel floor. A reinforced concrete floor was laid and a railroad car, with a form the shape of the tunnel bore mounted on it, was moved into the excavated rectangular cell. Reinforcing steel was set in place and concrete poured over the form and between the sheet piling walls of the rectangular cell. After the concrete had properly cured, the form car was moved into a new excavation section. Earth was then "backfilled" on top of the completed concrete and steel tunnel structure to bring the ground level above the tunnel back to its original condition prior to the time construction began. Approximately 450 feet of the tunnel were constructed by this "cut and cover" method.

The remaining portion of the tunnel (approximately 350 feet) was constructed by the "driven" method. This method, in essence, was equivalent to burrowing a hole through the earth. That is, not all of the earth above the tunnel was removed during construction. Only the earth from the tunnel bore plus enough to leave room for the tunnel lining was removed. Once all of the earth was removed from the tunnel bore a concrete floor was poured and reinforcing steel erected along the tunnel walls. Again the form car, previously described, was moved into the tunnel. Concrete was then pumped into the space between the form and the steel lining along the walls. When the concrete had cured, the form car was moved forward and the process repeated until all the walls in the "driven" section of the tunnel were lined with concrete and steel.

At each end of the tunnel a concrete "portal" was constructed consisting of a concrete archway over the entrance and concrete retaining walls stretching out from the archway. The purpose of the retaining walls was to retain the earth above the tunnel from falling into the approach sections.

Since the approach sections at each end of the tunnel descended below the original surrounding ground level, the earth sides of the approaches had to be sufficiently sloped to prevent dirt from sliding onto the roadbed. As a further protection against earth slides, short concrete retaining walls, or, in some cases, "cribs"[1] were placed at the foot of each side of the approach to retain the earth. Additionally, hand-placed stones, grass seed, and a light asphalt spray were used to help stabilize the slopes until the natural vegetation had grown sufficiently.

After the tunnel was constructed and slope stabilization completed, a permanent track structure was constructed through the tunnel.

During construction of the "cut and cover" sections of the tunnel, various sewer, water, and utility lines had to be temporarily relocated. Once these sections of the tunnel were completed, these utility lines, etc., were replaced in their original position. In addition, a surface street and sidewalk above the tunnel had to be torn up, a temporary bridge constructed, and then the street rebuilt once construction was completed. Similarly, a parking lot had to be torn up and rebuilt and certain railroad tracks relocated.

Upon completion of the tunnel, track, and related facilities, petitioner prepared a final roadway completion report which includes all of the costs incurred in the tunnel construction project. Roadway completion reports are documents required by the Interstate Commerce Commission (hereafter referred to as ICC) to record the costs of capital additions to a railroad company's books. Petitioner's report allocated costs of the project to various accounts as required by the ICC. Respondent does not contest the accuracy of the figures stated in this report and we find them to be a true, accurate representation of the actual costs incurred in the construction project.

On the completion report petitioner reported expenditures as follows (summarized):

---

[1] "Cribs" are precast concrete blocks linked together to form a short retaining wall.

| ICC account | Description | Amount |
|---|---|---|
| 2 | Easement; relocation and/or rebuilding of utility and communication lines, streets, etc. _____ | $151,457.04 |
| 3 | Grading, etc. _____ | 289,128.59 |
| 5 | Tunnel excavation, backfill, lining, etc. _____ | 2,029,005.79 |
| 6 | Culverts and drains _____ | 4,050.97 |
| 8 | Ties _____ | 12,263.82 |
| 9 | 115-lb. rail _____ | 11,608.07 |
| 10 | Joints, tie plates, spikes, etc. _____ | 11,299.16 |
| 11 | Stone ballast _____ | 4,682.16 |
| 12 | Track laying and surfacing (labor)_____ | 21,882.57 |
| 13 | Fence, gates, and maintenance signs _____ | 4,620.16 |
| 26 | Telephone booth _____ | 714.50 |
| 27 | Signals _____ | 53,812.47 |
| 71 | Legal fees, witness fees, soil investigation, etc. _____ | 42,983.41 |
| | Total _____ | 2,637,508.71 |

## Depreciation

Of the above costs incurred in the tunnel project, petitioner claimed on its income tax returns depreciation deductions by the straight line method as follows:

| ICC account | Description | Amount | Useful life (years) |
|---|---|---|---|
| 3 | Grading, etc._____ | $289,128.59 | 30 |
| 5 | Tunnel, etc. _____ | 2,029,005.79 | 30 |
| 6 | Culverts, etc. _____ | 4,050.97 | 30 |
| 13 | Fences, etc._____ | 4,620.16 | 30 |
| 26 | Communications_____ | 714.50 | 14 |
| 27 | Signals and interlockers _____ | 53,812.47 | 14 |
| | Total _____ | 2,381,332.48 | |

Petitioner did not claim any depreciation deductions for the items listed in ICC accounts 2, 8, 9, 10, 11, and 12 on its income tax returns and treated the amounts listed in ICC account 71 as organization expenditures (amortizable over 60 months).

Although depreication deductions were not claimed originally with respect to some ICC accounts, the parties are now in agreement over the proper depreciation allowable for accounts 8, 9, 10, 11, and 12. Further, respondent does not contest petitioner's treatment for depreciation purposes of accounts 6, 13, 26, and 27.[2]

---

[2] Respondent does, however, contest an investment credit for certain items in account 13 which will be discussed later.

Respondent has, however, disallowed any deductions for ICC account 71. While petitioner agrees the costs listed therein were not organization expenditures, it still claims an allowance for depreciation with respect to most of these costs. Additionally, petitioner now claims depreciation deductions for the costs in ICC account 2.[3] Consequently, the only ICC accounts which contain items on which depreciation is disputed are 2, 3, 5, and 71.

A further breakdown of account classifications is necessary to a resolution of the issues in this case.

ICC account 2 includes $90,013.70 as the cost of the easement acquired from the Southern Railway allowing petitioner to construct the tunnel under existing surface streets and track lines. The remaining portion of account 2 consists of costs incurred in relocating and rebuilding certain items during construction of the "cut and cover" sections of the tunnel. Those items are:

| | |
|---|---:|
| Remove and rebuild service station | $14,105.73 |
| Relocating CRR communication lines | 2,589.82 |
| Relocating city, gas, sewer and water lines | 12,591.99 |
| Temporary bridge Magnolia Street | 2,478.86 |
| Relocate telephone cables | 418.00 |
| Relocate Amaker coal track | 1,822.68 |
| Remove ACL-P&N connection | 1,527.25 |
| Relocate SRR communication lines | 3,234.55 |
| Relocate ACL-Sou. connection | 8,180.70 |
| Relocate Sullivan hardware track | 506.47 |
| Replacing streets and sidewalks | 4,121.89 |
| Rebuild SRR parking lot | 9,865.40 |
| Total | 61,443.34 |

Petitioner only claims some of the costs in ICC account 71 are subject to depreciation. These were additional costs incurred in acquiring the easement from the Southern Railway through litigation and condemnation proceedings and are as follows:

| | |
|---|---:|
| Attorney fees | $28,783.57 |
| Witness fee and expense | 6,781.35 |
| Appraisal fee | 630.00 |
| Briefs, hearings, photographs, etc. | 630.52 |
| Premium on injunction bond | 265.18 |
| Tunnel model for hearing | 1,574.05 |

---

[3] Petitioner's claims for depreciation with respect to the costs in ICC accounts 2 and 71 were made after trial by an amended petition.

| | |
|---|---|
| Soil investigation and testimony | $2,691.72 |
| Total | 41,356.39 |

ICC account 3 listed by petitioner as "Grading" in its income tax return includes the following items (some of which are summarized by the Court):

| | |
|---|---|
| Clearing | $4,105.02 |
| Excavation, unclassified | 97,507.34 |
| Overhaul | 4,631.00 |
| Slope seeding | 6,047.39 |
| Slope paving | 4,832.98 |
| Cribbing | 26,055.31 |
| Paved ditch | 5,830.10 |
| Concrete retaining walls | 10,292.06 |
| Drains | 124,013.04 |
| Manholes | 5,814.35 |
| Total | 289,128.59 |

All of these costs are attributable to construction of the approach sections of the tunnel project. The parties agree that $176,837.84 of such costs, listed as slope paving, cribbing, paved ditch, concrete retaining walls, drains, and manholes, are depreciable over a 30-year useful life. However, respondent has disallowed any depreciation deductions for the remaining $112,290.75 in account 3 listed as clearing, excavation unclassified, overhaul, and slope seeding.[4]

ICC account 5 of the roadway completion report includes an item of $1,096,341.96 listed as "Tunnel excavation unclassified," and other items totaling $932,663.83 which we will refer to as "backfill and tunnel lining." "Tunnel excavation unclassified" represents the cost of labor, equipment, and some materials incurred in excavating dirt within the 800-foot tunnel by both the "cut and cover" and "driven" methods of excavation. The major portion of this cost (75 percent) is attributable to excavating earth from within the tunnel bore itself (approximately 13,030 cubic yards of earth). The remaining 25 percent is the cost of excavating earth from that area of the ground above the tunnel lining (which was removed during the

---

[4] "Clearing" refers to the necessary preparation of the land prior to beginning the actual excavation of the approach sections. "Excavation, unclassified" refers to the costs, including labor, equipment, and materials incurred in excavating the dirt and shaping the sides and roadbed of the approaches. "Overhaul" is the cost of moving excavated dirt more than 1,000 feet from the excavation site. "Slope seeding" is the cost of seeding the sloped sides of the approaches with grass seed as a means of erosion control.

"cut and cover" phase of excavation and had to be backfilled on top of the lining once the tunnel was completed—i.e., approximately 6,530 cubic yards of earth).

"Backfill" refers to the cost of replacing dirt over the "cut and cover" sections of the tunnel once the concrete lining has cured in order to restore the ground above the tunnel to its original elevation. The term "tunnel lining" includes the cost of materials and labor used to construct the concrete and steel reinforced floor, walls, and portals of the tunnel.

The parties agree the "backfill and tunnel lining" costs in ICC account 5 may be depreciated over a useful life of 50 years, but respondent has disallowed any depreciation deductions for the $1,096,341.96 cost of "Tunnel excavation unclassified."[5]

### Investment Credit

On its Federal income tax return for 1963 (a year not before the Court), petitioner claimed the 7-percent investment credit based on an investment in the tunnel project of $2,381,332.48 as follows:

---

[5] In the statutory notice of deficiency issued to petitioner, respondent determined that an item listed therein as "Other tunnel components," with a basis of $1,109,501.67, had a useful life of 50 years, rather than 30 years as reported by petitioner on its income tax returns. In exhibit A, attached to the notice of deficiency, "Other tunnel components" is identified as consisting of unnamed items from accounts 3 and 5 of the ICC roadway completion report. Stipulation of facts par. 14 in this case says:

"14. Respondent, in his statutory notice, determined that an item designated in the notice as 'Other tunnel components' with a basis of $1,109,501.67 has a useful life of 50 years rather than 30 years claimed by petitioner. Petitioner agrees that this determination by respondent is correct."

Since respondent has disallowed any deduction for the cost listed in ICC account 5 as "Tunnel excavation unclassified" ($1,096,341.96) we have concluded the remaining $932,663.83 in account 5 ("backfill and tunnel lining") comprises a portion of the $1,109,501.67 referred to in stipulation of facts par. 14 as having a useful life of 50 years. The balance of the "Other tunnel components" in stipulation of facts par. 14 amounts to $176,837.84 and must come from ICC account 3.

Of the total costs listed in ICC account 3 ($289,128.59), we have already indicated that respondent disallowed any deduction with respect to $112,290.75 listed therein as clearing, excavation, overhaul, and slope seeding. The balance in account 3 is $176,837.84. While this is the precise amount of the excess "Other tunnel components" referred to above and would thus warrant depreciation over a 50-year life, stipulation of facts par. 12 complicates the issue:

"12. Petitioner charged a total of $289,128.59 to ICC account 3. Included in this account were $176,837.84 of assets such as slope paving, cribbing, concrete retaining walls, drain pipes and manholes. Petitioner claimed a 30-year life on those items and respondent agrees with such claimed depreciation. * * *"

There is, therefore, a conflict in the stipulations. However, because stipulation of facts par. 12 is more specific than par. 14 (the latter referring only to "Other tunnel components"), we find par. 12 controlling. That is, the $176,837.84 referred to in par. 12 of the stipulations is depreciable over a 30-year useful life.

| ICC account | Description | Cost | Claimed investment credit |
|---|---|---|---|
| 3 | Grading | $289,128.59 | $20,239.00 |
| 5 | Tunnels and subways | 2,029,005.79 | 142,030.41 |
| 6 | Bridges, trestles, and culverts | 4,050.97 | 283.57 |
| 13 | Fences, snowsheds, and signs | 4,620.16 | 323.41 |
| 26 | Communications | 714.50 | 50.02 |
| 27 | Signals and interlocks | 53,812.47 | 3,766.87 |
| | Total | 2,381,332.48 | 166,693.28 |

Of the $166,693.28 claimed, $41,453.51 was used by petitioner in 1963 and the remainder carried over to the years before us.

In the statutory notice of deficiency respondent disallowed $84,914.20 of the claimed credit [6] as follows:

| ICC account | Description | Cost | Claimed credit disallowed |
|---|---|---|---|
| 3 | Clearing | $4,105.02 | $287.35 |
| 3 | Excavation, unclassified | 97,507.34 | 6,825.52 |
| 3 | Overhaul | 4,631.00 | 324.17 |
| 3 | Slope seeding | 6,047.39 | 423.32 |
| 5 | Tunnel excavation | 1,096,341.96 | 76,743.94 |
| 13 | Chain link fence | 4,160.66 | 291.25 |
| 13 | Pipe frame gates | 266.44 | 18.65 |
| | Total | 1,213,059.81 | 84,914.20 |

The chain link fences and pipe frame gates were installed on the ground surface above the tunnel to prevent passersby and animals from wandering into the approach sections of the tunnel or the tunnel itself. Since the tunnel was constructed in a densely populated metropolitan area, the fences and gates were necessary for public safety as well as for security of railroad property. The results could be disastrous if people, more particularly children, were to wander into the approaches and find themselves trapped there as a train passed through the tunnel. Needless to say, an accident on the track would impede the flow of traffic.

The only other items for which an investment credit is disputed are those costs in account 2 attributable to relocating and rebuilding certain sewer, water, and utility lines, etc., and for which depreciation has been claimed.

---

[6] Realizing that no adjustments can be made for 1963, respondent seeks only to determine the proper amount of the investment credit for 1963 in order to determine the carryover credit available in the years before us.

OPINION

The disputes in this case involve the proper treatment for purposes of depreciation and the investment credit of numerous costs incurred in connection with obtaining an easement and constructing a railroad tunnel thereon. More specifically, the issues remaining for our resolution are whether depreciation deductions are allowable for: the costs of clearing, excavation of approaches, overhaul, and slope seeding referred to in ICC account 3;[7] the cost of tunnel excavation referred to in ICC account 5; the costs incurred in obtaining the easement to construct the tunnel referred to in ICC accounts 2 and 71; and the costs of relocating and rebuilding the streets, sidewalks, utility lines, etc., also referred to in ICC account 2. In addition, we must decide whether an investment credit is available for all of the above-disputed items (with the exception of the costs incurred in obtaining the easement, for which it is undisputed that there is no investment credit available) as well as the costs of installing chain link fences and pipe frame gates around the tunnel project.

### Depreciation of Tunnel Bore and Approach Grading Costs

The single cost figure in ICC account 5 listed as "Tunnel excavation unclassified" represents the cost of excavating the earth from within the 800-foot tunnel structure. The major portion (75 percent) of the cost of excavation within this section of the tunnel project consisted of removing earth from what is now the tunnel bore—a hole in the ground.[8] The disputed costs

---

[7] Clearing, excavation of tunnel approachways, overhaul, and slope seeding items are generally grouped in the grading account, which is ICC account 3. For convenience these items, collectively, will sometimes be referred to as "grading." It has been said that "As applied to railroad construction, grading is the physical change of the ground surface to prepare the ground for the reception of ballast, ties and track. It consists of both cuts and fills." *Western Maryland Railway Co. v. United States,* 291 F. Supp. 935, 938 (D. Md. 1968).

[8] In our findings we determined that approximately two-thirds of the earth excavated from within the 800-foot tunnel came from the tunnel bore itself (approximately 13,030 of a total 19,560 cubic yards of earth). The remaining one-third consisted of earth removed from above the proposed tunnel lining (during the "cut and cover" phase of construction) which had to be backfilled on top of the tunnel once it was completed. While the cost of backfilling is separately identified, the cost of initially removing this earth above the tunnel lining is included in the total figure for "Tunnel excavation unclassified." We have made this allocation of cubic yards based upon figures supplied by petitioner for total cubic yards of earth removed and total cubic yards backfilled. While the figures are only approximations, we feel they are sufficiently reliable for allocation purposes here. However, it does not necessarily follow that because two-thirds of the earth excavated is attributable to the tunnel bore, that two-thirds of the cost of excavation is also at-

in ICC account 3 are the costs of grading the approach sections of the tunnel project to prepare the ground for the laying of track (see n. 7 *supra*).

Petitioner maintains that its railroad tunnel should be viewed as a single asset and all the costs attributable to its construction depreciated over the life of that asset. Each component is an integral part of the whole, petitioner feels, and without each part the whole would be useless. Petitioner concludes the tunnel has a 50-year life and that all the disputed costs herein are depreciable over that period.

Alternatively, petitioner argues that even if we treat the various components of the tunnel separately, none of them will be useful beyond the life of the tunnel lining, stipulated to be 50 years.

Respondent contends the disputed costs are all attributable to assets which have useful lives independent of the original tunnel lining and those useful lives are not subject to reasonable estimation. Respondent feels that as long as petitioner wishes to maintain a tunnel at the present location the costs of excavating the tunnel bore and grading the approaches will never have to be incurred again. This is true, he argues, even if the tunnel has to be enlarged or "daylighted"[9] to accommodate larger railroad cars. Respondent concludes that railroad tunnel bores and grading do not wear out within the meaning of section 167 of the Internal Revenue Code of 1954,[10] and are, therefore, nondepreciable.

We think the issues here are difficult to resolve and it is not without doubt that we resolve most of them in favor of the respondent.

Section 167(a) states:

---

tributable to the tunnel bore. This would only follow if the unit cost of excavation was identical under both the "cut and cover" and "driven" methods of excavation. We believe the "driven" method to be the more expensive of the two (otherwise it would have been used throughout). The one-third of the excavation attributable to earth above the tunnel lining was removed by the "cut and cover" method. Since this was the less expensive method of excavation, we think we should discount the one-third figure to reflect this fact. Accordingly, only 25 percent of the cost of "Tunnel excavation unclassified" listed in ICC account 5 should be attributed to this one-third of the excavation. *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930). Seventy-five percent of such cost then is attributable to excavation of the tunnel bore. Our determination here is an approximation based on all the evidence presented and reasonable inferences to be drawn therefrom.

[9] This involves permanently removing the roof and all earth above the tunnel.

[10] All statutory references herein refer to the Internal Revenue Code of 1954, as in effect for the years relevant to this litigation.

There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

## Section 1.167(a)-1, Income Tax Regs., states:

(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and § 1.167(g)-1. * * *

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or busines., and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determinatio⌐. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. * * *

The present case was tried and briefed before our opinion in *Chesapeake & Ohio Ry. Co.,* 64 T.C. 352 (1975), in which we addressed the question of the depreciability of railroad tunnel bores and track grading costs. We found:

With proper maintenance neither grading nor tunnel bores (apart from tunnel linings, ventilating and lighting systems, retaining walls, etc.) have any determinable physical lives, and neither grading nor tunnel bores have any salvage value upon retirement. [64 T.C. at 369.]

However, we went on to decide depreciation was allowable:

Neither grading nor tunnel bores, when properly maintained, are subject to physical exhaustion due to wear and tear. On the other hand, the Commissioner does not dispute that due to obsolescence these assets will at some time

lose their usefulness to petitioner and be retired. The controversy here centers on what is essentially a factual inquiry, namely, do these assets have reasonably determinable useful lives, as required by the regulations, upon the basis of which may be computed a reasonable yearly allowance for depreciation. * * * [64 T.C. at 377.]

We determined in *Chesapeake* that upon the evidence presented the useful lives of the grading and tunnel bores in issue were susceptible of reasonable estimation, and that the average useful life for both grading and tunnel bores was 100 years. However, because many of the assets in each class were placed in service long before 1954 (the earliest year before the Court), we revised the original 100-year life down to 60 years as the average remaining useful life for property in service in 1954.

We must proceed with caution before claiming that because of our opinion in *Chesapeake* all railroad tunnel bores and track grading are depreciable assets. We issued a caveat to our opinion at pages 383-384 therein:

The decision we have reached here is based solely on the particular facts and circumstances of the record before us and is in no way intended to foreclose a different decision on the basis of a different record. * * * In particular we wish to correct any possible impression that by the result herein we have endorsed a general rule in respect of the depreciability of other railroads' grading and tunnel bores. That question must await resolution in light of the pertinent facts and circumstances of each taxpayer. [64 T.C. at 383-384.]

The record in the present case differs a great deal from that in *Chesapeake.* The outstanding difference between the two cases is that here petitioner has presented virtually no evidence of the useful life of its tunnel or grading. Instead, it has rested its case entirely on the useful life of the original tunnel lining, stipulated to be 50 years. In contrast, the taxpayer in *Chesapeake* presented extensive expert testimony, charts, graphs, studies, and evidence of its past history, giving the Court a reasonable indication of when its grading and tunnels would be retired.

The issue in our case is essentially the same as that in *Chesapeake,* namely, "do these assets have reasonably determinable useful lives." 64 T.C. at 377. We think this is true whether we consider the tunnel as a single asset or consider each of its component parts individually. As is often the case, the burden of proof on this issue is on petitioner. *Welch v. Helvering,* 290 U.S. 111 (1933).

Useful life for depreciation purposes need not be established with certainty. A "reasonable approximation" is all that need be shown. *Burnet v. Niagara Brewing Co.,* 282 U.S. 648, 655 (1931). Indeed, only a "rough estimate" was required by the Supreme Court in *United States v. Ludey,* 274 U.S. 295, 302 (1927), when it addressed a related problem of determining a depletion allowance for mineral reserves.

Initially, we reject respondent's argument that railroad grading and tunnel bores are nondepreciable per se. See *Chesapeake & Ohio Ry. Co., supra.* In addition to *Chesapeake,* there are other cases which have allowed depreciation for railroad track grading and certain kinds of tunnels, albeit with little or no discussion. *Richmond Belt Railway Co.,* 13 B.T.A. 1291 (1928); *E.W. Edwards & Sons,* 3 B.T.A. 889 (1926). Each case must be looked at individually. Unlike *Richmond Belt Railway Co., supra,* the assets in our case are not subject to physical exhaustion. However, we believe they may be subject to obsolescence within the meaning of section 167(a). But this is only the starting point. The remainder of petitioner's journey is fraught with misfortune.[11]

Petitioner's first argument is an appealing one. It draws an analogy between the construction of a building and construction of a tunnel. According to Rev. Rul. 65-265, 1965-2 C.B. 52, the excavation costs for the foundation of a building are properly includable as part of the depreciable cost basis of the building constructed, and as such, depreciable over the life of the building. Petitioner asserts that the cost of excavating the tunnel bore and grading the approaches should be included in the depreciable cost basis of the entire tunnel.

This is an argument we need neither accept nor reject. For even if we assume petitioner's contention is correct and the

---

[11] Sec. 185 is not applicable to the facts of the present case. That section was enacted into law as part of the Tax Reform Act of 1969, Pub.L. 91-172, sec. 705(a), 83 Stat. 487, 672-673, and allows taxpayers an election to amortize the costs of railroad grading and tunnel bores over a 50-year period. The section applies only to grading and tunnel bores, the original use of which commences after Dec. 31, 1968.

There is presently a bill in Congress to make the amortization provisions of sec. 185 applicable to railroad grading and tunnel bores placed in service prior to 1969. H.R. 10612, 94th Cong., 2d Sess. 1009 (1976). The Senate version of the bill is identical to the House version in this regard. See H.R. 10612, 94th Cong., 1st Sess. 439 (1975). See also S. Rept. No. 94-938, 94th Cong., 2d Sess. 483 (1976); H. Rept. No. 94-658, 94th Cong., 1st Sess. 368 (1975). If enacted into law as presently written, the bill will not affect the years before us. Nothing said in this opinion is inconsistent with sec. 185, the proposed amendments, or the legislative history of either.

disputed costs here are part of the cost of a single asset (a tunnel), that asset has not been shown to be depreciable. That is, petitioner has failed to establish with reasonable accuracy the useful life of the whole tunnel. The useful life of 50 years to which the parties have stipulated relates only to the concrete and steel lining and portals (only parts of the whole as petitioner views it). This is the single shred of evidence of useful life to which petitioner has chosen to append its entire case. However, we are not convinced by any of the evidence presented that the whole tunnel has a useful life equal to that of only one of its parts (the lining). From our understanding of the methods of construction used to build the tunnel and the testimony presented, we think that replacement of part or all of the lining as it wears out is not unreasonable. Consequently, the tunnel will remain useful beyond the time the original lining wears out.

Commonsense plays an important role in the resolution of legal disputes and we fervently strive never to lose sight of it. We trust we have not here. Petitioner's expert testified that without a tunnel lining the tunnel would in all probability collapse, rendering the tunnel useless. We agree that without *any* lining the tunnel would collapse. However, we think it unrealistic to believe petitioner would ever let this happen. The tunnel cost over $2½ million to build and provided a very important interchange connection in the rail system of petitioner's parent corporation. The lining could, and most likely would, be replaced as it neared the end of its useful life; thereby enabling use of the tunnel to continue indefinitely. The testimony that without *any* lining the tunnel would collapse does not establish that a new lining cannot be placed in the tunnel after the original tunnel lining wears out. The 50-year life stipulated to for the tunnel lining is only that of the *original* tunnel lining. We cannot catapult the life for the original tunnel lining into the life of the entire tunnel without evidence such leap in logic comports with reality. That is, we cannot *assume,* as petitioner would like, that the entire tunnel will be useless after the original lining wears out.[12]

---

[12] Petitioner has acknowledged the lack of evidence of useful life apart from that stipulated to for the tunnel lining. On p. 27 of its reply brief it says:

"Respondent complains that petitioner put on no evidence as to the life of the tunnel excavation costs. In the circumstances of this case there was no need to put evidence of the individual lives of the various constituent costs of the tunnel. Since the tunnel had no usefulness in excess of the lining, there would be no purpose for putting on evidence as to

Petitioner's alternative argument falters for the same reason. Even if we view the components of the tunnel as separate, individual assets, there is nothing in the record which convinces us the useful lives of the components (tunnel bore and grading) are limited to that of the original tunnel lining. Without any other evidence of the useful life of the tunnel bore and grading we are unable to allow petitioner any depreciation deductions with respect thereto.

Petitioner has drawn our attention to several cases involving grading or excavation where the excavation itself, although not subject to physical exhaustion, is nonetheless so directly associated with an asset which is subject to physical exhaustion, that the former was found to be depreciable over the useful life of the latter. In *Norfolk Shipbuilding & Drydock Corp. v. United States,* 321 F.Supp. 222 (E.D. Va. 1971), the court allowed the costs of dredging a river in connection with the construction of pier facilities to be depreciated over the useful life of the pier. Rejecting the Commissioner's contention that the dredging would be useful beyond the life of the original pier, the court stated: "The evidence clearly demonstrates that developments in the shipping industry will probably render the dredging unusable in subsequent pier construction. [321 F. Supp. at 226.]" Cf. *Union Electric Co. v. Commissioner,* 177 F.2d 269 (8th Cir. 1949).

In our case, the evidence presented was insufficient to persuade us that the costs of excavating the tunnel bore and grading the approachways will be useless after the original tunnel lining wears out. For this reason *Norfolk Shipbuilding* is distinguishable.

Petitioner also cites *Algernon Blair, Inc.,* 29 T.C. 1205 (1958), for the proposition that grading costs associated with the construction of depreciable buildings are part of the depreciable basis of the building. This, however, is not the holding of the case. The disputed clearing and grading costs therein were held to be "inextricably associated" with the land and nondepreciable. And there is another difference between *Algernon Blair, Inc.,* and our case. Even though the grading and excavation costs here

---

the parts unless petitioner was seeking a life for the components less than that of the lining. * * *"

This, of course, presupposes the life of the original lining is coterminous with the life of the entire asset, a supposition we have rejected.

may be directly associated with the tunnel (and we think they are), petitioner has failed to demonstrate that the tunnel as a single unit is depreciable. It is only the tunnel lining which has been shown to be depreciable and only for the reason that it is made out of concrete and steel and will deteriorate. We do not think the grading and tunnel bore excavation costs are so directly associated with the original tunnel lining as to be depreciable over the life of the latter. The grading and tunnel bore will be of use as long as a tunnel is maintained at the present location, even after the original lining has worn out and been replaced.

After a thorough analysis of all the evidence, we are unable to estimate with any reasonable accuracy the useful life of petitioner's tunnel bore and grading, and we must, therefore, deny petitioner any depreciation deductions with respect to the cost of these assets.

### Depreciation of Easement Costs

The costs incurred in obtaining the easement to build the tunnel under the existing lines of the Southern Railway include $90,013.70 from ICC account 2 and $41,356.30 from ICC account 71. Petitioner asserts that these costs were part of the construction of the tunnel and, therefore, depreciable over the life of the tunnel (again considered by petitioner as the 50-year life of the lining). Respondent contends that the easement here has an indeterminant useful life and is not depreciable.

We believe the costs here are all attributable to acquiring the easement to construct and operate the tunnel under the existing lines of the Southern Railway. As such, they are depreciable over the useful life of the easement itself. The problem, of course, is determining the useful life of the easement. Cf. *Pennsylvania Power & Light Co. v. United States,* 411 F.2d 1300 (Ct. Cl. 1969); *Virginia Electric & Power Co. v. United States,* 411 F.2d 1314 (Ct. Cl. 1969). There is no evidence in the record regarding the term over which the easement extends. We will assume, therefore, it is of indefinite duration limited only by abandonment.

We think petitioner has properly tied the useful life of the easement to the useful life of the entire tunnel. That is, once the tunnel ceases to be of use in petitioner's business, the easement will also cease to be useful. However, again we cannot assume the useful life of the entire tunnel is coterminous with the useful life

of the original tunnel lining. And since it is only for the latter item that petitioner has established a useful life (based on the 50-year life stipulated to), we must deny petitioner any deduction for depreciation with respect to the costs of obtaining the easement.

A comparable case is that of *Pennsylvania Power & Light Co. v. United States, supra.* The dispute there concerned the useful lives of right-of-way easements acquired by the utility company to construct powerlines. The easements themselves were of indefinite duration limited only by abandonment. The court stated:

> Thus, the basic question in this case on this issue is whether taxpayer has established by a preponderance of the evidence that its easements (intangible assets) will be useful in its business for a limited period, estimated with reasonable accuracy. Taxpayer has made no effort to show that each easement has a useful life limited to the useful life of the original powerline constructed and maintained thereon, and it is not established that the termination of the useful life of any existing powerline will necessarily result in abandonment or retirement of its related easement. In other words, there is no evidence that the costs of removal of an obsolete or worn out powerline and construction of a replacement line on the same easement would make such a practice economically prohibitive, and thus require abandonment of that easement when the useful life of its original powerline terminated. * * * [411 F.2d at 1304.]

The court then distinguished several cases involving easements to lay pipelines for petroleum products or natural gas. In these latter cases the easements were shown to be coterminous with the useful lives of the original pipelines either because it was economically unfeasible to replace the pipelines after they wore out and the easements had to be abandoned, or the natural gas reserves supplying the raw material in the pipelines were exhaustible over a reasonably estimated period, thus rendering the pipelines and the easements useless.

The court, in *Pennsylvania Power & Light Co.,* refused to allow the easements to be depreciated over the useful lives of the original powerlines placed on the easements. Nonetheless, useful lives for the easements were established by the taxpayer independent of the useful lives of the original powerlines. Expert testimony similar to that presented in *Chesapeake & Ohio Ry. Co., supra,* was introduced showing the average period of time over which these easements would be used by the taxpayer before being retired. The testimony went directly to the issue of

the useful lives of the easements themselves and the court concluded the taxpayer had thereby established the requisite useful lives.

In the present case we cannot conclude that the useful life of the easement acquired to construct the tunnel is coterminous with that of the original tunnel lining. Petitioner's failure to present any other evidence of the useful life of its easement requires that we deny any depreciation deductions with respect thereto.

The following cases, though dealing with the depreciation of easement costs, are all distinguished by virtue of the fact that the taxpayers therein presented evidence sufficient to satisfy their burden of proof on the issue of the useful lives of the easements in question: *Southern Natural Gas Co. v. United States,* 412 F.2d 1222 (Ct. Cl. 1969); *Texas-New Mexico Pipe Line Co. v. United States,* 401 F.2d 796 (Ct. Cl. 1968); *Badger Pipe Line Co. v. United States,* 401 F.2d 799 (Ct. Cl. 1968); *Commonwealth Natural Gas Corp. v. United States,* 395 F.2d 493 (4th Cir. 1968); *Northern Natural Gas Co. v. O'Malley,* 277 F.2d 128 (8th Cir. 1960); *Union Electric Co. v. Commissioner,* 177 F.2d 269 (8th Cir. 1949); *Tenneco, Inc. v. United States,* 301 F.Supp. 598 (S.D. Tex. 1969); *Great Lakes Pipe Line Co. v. United States,* 293 F.Supp. 1073 (W.D. Mo. 1968); *Oklahoma Gas & Electric Co. v. United States,* 289 F.Supp. 98 (W.D. Okla. 1968); *Shell Pipe Line Corp. v. United States,* 267 F.Supp. 1014 (S.D. Tex. 1967). See Rev. Rul. 71-448, 1971-2 C.B. 130.

### *Depreciation of Temporary Relocation Costs and 25 Percent of Tunnel Excavation Costs*

Respondent's expert witness testified that when the original tunnel lining nears the end of its useful life and has to be replaced, the earth above the lining in the "cut and cover" sections of the tunnel will again be removed. For this reason depreciation deductions were allowed for the costs of backfilling dirt over the cement shell of the tunnel lining. The useful life over which the backfill costs are.to be spread is stipulated to be 50 years, the same as the useful life of the tunnel lining.

We think this same reasoning applies to the initial cost of removing the dirt which had to be backfilled over the tunnel (i.e., 25 percent of the original excavation costs in ICC account

5),[13] as well as to some of the relocation costs listed in ICC account 2. That is, when the original lining has to be replaced, earth will have to be removed from above the tunnel, streets again torn up, utilities relocated, etc., just as was done originally. However, some of the items in ICC account 2 were *permanently* relocated and we cannot determine whether the costs attributable to these items will ever be incurred again. Rather, we think only those costs attributable to *temporarily* relocating items which were returned to their original position upon completion of the tunnel will be incurred again when the original tunnel lining wears out. Although the testimony indicating which items in ICC account 2 were only temporarily relocated is not particularly strong, we are convinced the following costs in account 2 (in addition to the 25 percent of the excavation costs mentioned above) are depreciable over the 50-year life of the original lining:

| | |
|---|---:|
| Relocation CRR communication lines | $2,589.82 |
| Relocating city gas, sewer, and water lines | 12,591.99 |
| Temporary bridge Magnolia Street | 2,478.86 |
| Relocate SRR communication lines | 3,234.55 |
| Replacing streets and sidewalks | 4,121.89 |
| Rebuild SRR parking lot | 9,865.40 |

### Investment Credit

Our resolution of the depreciation issues in this case goes a long way in resolving the disputed investment credit issues. Respondent rightly contends no investment credit is allowable for those costs which are not depreciable. Petitioner agrees with this, but contends the disputed costs are depreciable. The disputed costs include those attributed to grading, tunnel excavation, relocation of utility lines, etc. (in ICC account 2), and certain items in ICC account 13.

While the year 1963 is not before us, we must determine the proper amount of the investment credit in that year in order to determine the carryover credit available for the years following.

Section 48(a) defines "section 38 property" which qualifies for the investment credit. Section 48(a), as in effect in 1963, reau as follows:

---

[13] See n. 8 *supra.*

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, * * *

* * *

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

We have already determined that the tunnel bore and grading costs incurred by petitioner are not depreciable using methods of depreciation which measure the life of assets in terms of years. Petitioner argues, however, that even if these methods of depreciation are not available to it, these assets are depreciable under the retirement-replacement-betterment method of accounting.[14] This is a permissible method of accounting for depreciable assets under section 167. *Chesapeake & Ohio Ry. Co., supra* at 364; *St. Louis-San Francisco Railway Co. v. United States,* 470 F.2d 523, 526 (Ct. Cl. 1972). We must decide, therefore, whether this method is available for petitioner's use here.

The RRB method of accounting is perhaps best described in *Boston & M.R.R. v. Commissioner,* 206 F.2d 617 (1st Cir. 1953), where the court said at page 619:

Under the retirement system of accounting, however, there are no annual depreciation charges as such, and hence no annual adjustments are made in the book values of the various assets. Only upon the ultimate retirement or replacement with betterments of any particular item of property or equipment is any change made in the investment account; and on that occasion, the full initial book value of the asset (i.e., usually the original cost) is taken out of the capital account, and this sum, diminished by the net salvage proceeds, is then charged to current expense (or in certain cases directly to profit or loss). Meanwhile, any repairs or minor replacements made during the life of the property are charged directly to current expense and are never reflected in the capital account. [Fn. ref. omitted.]

Under the RRB method of accounting for depreciable assets, the actual depreciation sustained on any particular asset in any year prior to its retirement is accounted for by "expensing" the

---

[14] This method of accounting is sometimes referred to herein as the retirement method or RRB method.

cost of other assets on their retirement in that same year. As stated in the *Boston & M.R.R.* case:

> It is important to note immediately that the final charge to expense upon the retirement of a piece of equipment is not to be understood as an effort to make up for the failure to take any prior yearly "depreciation" on this particular item during its useful life. Rather the underlying theory of the retirement method is that the charges to expense on account of all the items retired or replaced in any particular year are taken as a rough equivalent of what would be a proper depreciation allowance for *all* the working assets of the company for that year. The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized, and hence will approximate the results under straight-line depreciation. At the same time it is thought that this method will eliminate the not inconsiderable bookkeeping problem of making annual depreciation adjustments on account of each and every asset owned by an extensive railroad. Thus, under both methods, the total charges to expense on account of any particular asset—to the extent that such a segregated concept makes any sense at all under the averaging approach of the retirement system— are the same; also, if the retirements occur fairly regularly, the total annual charge on account of equipment becoming unserviceable should eventually tend to become roughly equivalent under both methods. However, under the retirement system the total capital account (i.e., the book value of the assets) is always higher, since under that system no adjustments are made in this account until an item is actually retired. [*Boston & M.R.R. v. Commissioner, supra* at 619.]

Respondent does not contest the fact that petitioner will be entitled to a deduction for the cost of its grading and tunnel bore upon their retirement. But simply because the cost of an asset may be deducted on its retirement or abandonment does not mean the asset is depreciable under the retirement method of accounting.[15]

---

[15] Respondent's regulations recognize this distinction. Sec. 1.48-1(b), Income Tax Regs., states in part:

(b) *Depreciation allowable.* (1) Property is not section 38 property unless a deduction for depreciation (or amortization in lieu of depreciation) with respect to such property is allowable to the taxpayer for the taxable year. A deduction for depreciation is allowable if the property is of a character subject to the allowance for depreciation under section 167 and the basis (or cost) of the property is recovered through a method of depreciation, including, for example, the unit of production method and *the retirement method* as well as methods of depreciation which measure the life of the property in terms of years. * * * [Emphasis supplied.]
* * *

(3) If the cost of property is not recovered through a method of depreciation but through a deduction of the full cost in one taxable year, for purposes of subparagraph (1) of this paragraph a deduction for depreciation with respect to such property is not allowable to the taxpayer. However, if an adjustment with respect to the income tax return for such taxable year requires the cost of such property to be recovered through a method of

When petitioner abandons its tunnel bore and grading the losses sustained will represent losses of its investment in those assets, not depreciation sustained in that year on all the working assets of the business (or on all the assets in a particular classification). However, the RRB method is not to be understood as a means of accounting for the failure to take "prior yearly depreciation" on a particular asset. Rather, it is a means of accounting for the actual depreciation sustained on all the working assets of a business in any particular year. The deduction which petitioner may be entitled to on abandonment or retirement of its tunnel bore and grading is more in the nature of a loss deduction under section 165 than a depreciation deduction under section 167. Such a deduction does not fit within the theoretical framework of the retirement method of accounting. Accordingly, we do not believe the retirement method is available for petitioner's use here.

Petitioner's failure to establish any method by which it may depreciate its tunnel bore and grading requires that we deny an investment credit for the cost of these assets.

As to those items in ICC account 2 for which we have allowed deductions for depreciation, we think an investment credit is appropriate. Similarly, the 25 percent of the excavation cost in ICC account 5 for which we have allowed depreciation is part of the depreciable costs of the tunnel for investment credit purposes. See *Norfolk Shipbuilding & Drydock Corp. v. United States, supra* at 228. For those items in ICC account 2 which are not depreciable, no investment credit is allowed.

Respondent has also disallowed an investment credit for the cost of building chain link fences and gates around the approach sections of the tunnel. The purpose of the fences was to prevent people and animals from wandering into the approach sections.

Respondent contends the fences and gates are not integral parts of furnishing transportation. Petitioner contends that they are.

Section 1.48-1(d)(4), Income Tax Regs., provides:

Property is used as an integral part of one of the specified activities [manufacturing, production, extraction, or furnishing transportation, etc.] if it is used directly in the activity and is essential to the completeness of the activity. * * *

depreciation, a deduction for depreciation will be considered as allowable to the taxpayer. Cf. *Coca-Cola Bottling Co. of Baltimore v. United States,* 487 F.2d 528 (Ct. Cl. 1973).

Specific examples of property which normally would be used as an integral part of one of the specified activities are blast furnaces, oil and gas pipelines, railroad tracks and signals, telephone poles, broadcasting towers, oil derricks, and fences used to confine livestock. * * *

Similar reference is made to fences in the legislative history of section 48(a). Both S. Rept. No. 1881, 87th Cong., 2d Sess. 155 (1962), and H. Rept. No. 1447, 87th Cong., 2d Sess. A19 (1962), contain the following sentence: "Fences will qualify as section 38 property where used as an integral part of a specified activity as, for example, where used in connection with the raising of livestock."

Neither quote is too helpful to our resolution of the issue here other than to indicate both Congress and the Commissioner contemplated an investment credit being applied to fences under certain circumstances. We still must decide whether the fences and gates here are integral parts of furnishing transportation.

Respondent does not contest the fact that the cement retaining walls in the approach sections of the tunnel are integral parts of furnishing transportation. These retaining walls are necessary to prevent the dirt sides of the approaches from sliding onto the tracks. We find it difficult to understand how a wall to keep dirt off the tracks is an integral part of furnishing transportation, but a fence to keep people off the tracks is not. We think building a railroad tunnel and tracks through a heavily populated metropolitan area requires that some provision be made for public safety. Indeed, public safety is, and should be, as much an essential element in operating this particular railroad tunnel as are the railroad tracks themselves. We shudder to think what would happen if a curious child were trapped inside the tunnel as a train approached. An accident in the tunnel would obviously impede the flow of traffic. We, therefore, conclude that petitioner's chain link fences and gates are integral parts of furnishing transportation and come within the definition of "section 38 property" in section 48(a). Cf. *Yellow Freight System, Inc. v. United States,* 413 F. Supp. 357 (W.D. Mo. 1975) (fences surrounding trucking terminal to prevent cargo thefts were considered an essential element of the business of transporting goods), revd. on other grounds 538 F. 2d 790 (8th Cir. 1976); Rev. Rul. 66-89, 1966-1 C.B. 7 (fences used to keep livestock out of a cultivated field were essential to the cultivation activity). Contra Rev. Rul. 68-280, 1968-1 C.B. 20 (fence enclosing marine terminal not a part of the business activity); Rev. Rul. 68-1,

940

1968-1 C.B. 8 (fence surrounding trucking terminal not used directly in transportation activity).

*Decision will be entered under Rule 155.*